BARNABY HORTON ET AL. v. THOMAS J. MESKILL ET AL.

PETER D. GRACE ET AL. v. THOMAS J. MESKILL ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued December 8, 1976—decision released April 19, 1977

*David J. Della-Bitta,* assistant attorney general, with whom were *Bernard F. McGovern, Jr.,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellants-appellees (defendant state officials in both cases).

*Maurice T. FitzMaurice,* for the appellees-appellants (plaintiffs in both cases).

*Stephen Pierson* and *James F. Altham, Jr.,* each filed a brief as amicus curiae.

HOUSE, C. J. These appeals have been consolidated for presentation to this court because they present identical basic facts and identical questions of law. Pursuant to a stipulation approved by the

trial court, it has been agreed that any judgments in the cases against the defendants shall be fully binding on their successors in office without the necessity for substitutions of parties defendant owing to a change in the personnel occupying those offices.

The cases were brought seeking (1) a declaratory judgment that the system of financing public elementary and secondary education in this state, at least as it affects the town of Canton, violates the Connecticut and the United States constitutions; (2) an order in equity directing the defendants to cease implementing the present financing system, at least as it affects the town of Canton, except as necessary to provide an orderly transition to a constitutional system for financing public schools; (3) an order that the court retain jurisdiction to assure a transition with all deliberate speed to a constitutional system of financing public education; and (4) any other equitable relief the court should deem proper.

In essence, each action sought by declaratory judgment a judicial determination as to whether the Connecticut educational finance system, at least as it existed at the time of trial (1974), violates constitutional equal rights and equal protection guarantees and is constitutionally mandated "appropriate legislation"; Conn. Const. Art. VIII § 1; to provide free public elementary and secondary schools in the state. The questions presented are not only of great importance but of considerable complexity, and it is of small comfort to note that members of the judiciary throughout the country are also being faced with the same or similar complex ques-

tions.[1]  It is not inappropriate at the start of our consideration of the appeals to express a word of appreciation and commendation for the carefully prepared and helpful briefs submitted by counsel for the parties and by the amici curiae, and for the thorough and exhaustive record submitted by the trial court.

In order to facilitate an understanding of the plaintiffs' claims, it is virtually essential to have at hand the sections of the relevant statutes and provisions of the state and federal constitutions on which the plaintiffs rely.  They are set out in footnotes 2–9.

---

[1] A 1972 note in the Yale Law Journal noted that suits then at various stages of the judicial process "could overturn the systems of thirty-one states." "A Statistical Analysis of the School Finance Decisions:  On Winning Battles and Losing Wars," 81 Yale L.J. 1303.  Also in 1972 the governor's tax reform commission report noted (p. 47) that at that time there were cases similar to the present one pending in thirty-six other jurisdictions.  2 Governor's Commission on Tax Reform, Local Government—Schools and Property.

For a discussion of the status of litigation in the various jurisdictions as of January 1, 1976, see Lindquist & Wise, "Developments in Education Litigation:  Equal Protection," 5 J. Law. & Ed., No. 1, p. 1.

[2] "[Conn. Const. Art. VIII § 1] [FREE PUBLIC SCHOOLS.] Sec. 1 There shall always be free public elementary and secondary schools in the state.  The general assembly shall implement this principle by appropriate legislation."

[3] "[Conn. Const. Art. I § 1] [EQUALITY OF RIGHTS.] Sec. 1.  All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[4] "[Conn. Const. Art. I § 20] [EQUAL PROTECTION. NO SEGREGATION OR DISCRIMINATION.]  Sec. 20.  No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

[5] "[U.S. Const. Amend. XIV § 1] [CITIZENSHIP DEFINED. . PRIVILEGES OF CITIZENS.] Section 1. . . . No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

620

When the present actions were brought in 1974, the plaintiff Horton was enrolled in kindergarten in the Canton Elementary School, the plaintiff Barnhart in the sixth grade of the Canton Middle School, and the plaintiff Grace in the seventh grade in the Canton High School. The defendants included the governor, the treasurer and the comptroller of

[6] "[General Statutes] Sec. 10-240. CONTROL OF SCHOOLS. Each town shall maintain the control of all the public schools within its limits and for this purpose shall be a school district and shall have all the powers and duties of school districts, except so far as such powers and duties are inconsistent with the provisions of this chapter."

[7] "[General Statutes] Sec. 10-241. POWERS OF SCHOOL DISTRICTS. Each school district shall be a body corporate and shall have power to sue and be sued; to purchase, receive, hold and convey real and personal property for school purposes; to build, equip, purchase and rent schoolhouses and make major repairs thereto and to supply them with fuel, furniture and other appendages and accommodations; to establish and maintain schools of different grades; to establish and maintain a school library; to lay taxes and to borrow money for the purposes herein set forth; to make agreements and regulations for the establishing and conducting of schools not inconsistent with the regulations of the town having jurisdiction of the schools in such district; and to employ teachers, in accordance with the provisions of section 10-151, and pay their salaries. When such board appoints a superintendent, such superintendent may, with the approval of such board, employ the teachers."

[8] "[General Statutes] Sec. 10-220. DUTIES OF BOARDS OF EDUCATION. Boards of education shall maintain in their several towns good public elementary and secondary schools, implement the educational interests of the state as defined in section 10-4a and provide such other educational activities as in their judgment will best serve the interests of the town. . . ."

[9] "[General Statutes] Sec. 10-4a. EDUCATIONAL INTERESTS OF STATE IDENTIFIED. For purposes of sections 10-4, 10-4b and 10-220, *the educational interests of the state shall include, but not be limited to, the concern of the state (1) that each child shall have* for the period prescribed in the general statutes *equal opportunity to receive a suitable program of educational experiences;* (2) that each school district shall finance at a reasonable level an educational program designed to achieve this end; and (3) that the mandates in the general statutes pertaining to education within the jurisdiction of the state board of education be implemented." (Emphasis supplied.)

the state, the state commissioner of education, and the members of the state board of education, of the Canton board of education, and of the Canton board of finance.

The portions of the judgments of the Superior Court material to these appeals declared that the present system of financing public education in Connecticut, principally embodied in §§ 10-240 and 10-241 of the General Statutes, insofar as the system purports to delegate to the town of Canton the duty of raising taxes to operate free public elementary and secondary schools and insofar as it purports to delegate to Canton the duty of operating and maintaining free public elementary and secondary schools violates the constitution of Connecticut, article first, §§ 1 and 20, and article eighth, § 1; declared that the present system of financing public education in Connecticut does not violate the fourteenth amendment to the constitution of the United States; held that the doctrine of sovereign immunity is not a valid defense to this action; and withheld any ruling on the plaintiffs' ancillary claims for relief and retained jurisdiction until further orders.

The defendant state officials, hereinafter the defendants, appealed from the judgments and the plaintiffs cross appealed from the judgments insofar as they declared that the present system of financing public education in the state does not violate the fourteenth amendment to the constitution of the United States.

On their appeal, the defendants have pressed five assignments of error that relate to the trial court's findings, conclusions, and rulings on claims of law. The first two assignments of error pertain to the trial court's findings concerning the quality of edu-

cation in Canton and the relation between expenditures and the quality of education. They also pertain to the court's findings relevant to the effect of the existing system of financing education in the state, which system relies heavily on local property taxes and leads to a difference in revenue available to different towns for support of the public schools.

The third assignment of error is addressed to the conclusions which were reached by the court as a result of its findings of fact and which led to the ultimate conclusion expressed in its judgment— "that the present system of financing public education in Connecticut, principally embodied in §§ 10-240 and 10-241 of the General Statutes, insofar as the system purports to delegate to Canton the duty of raising taxes to operate free public elementary and secondary schools and insofar as it purports to delegate to Canton the duty of operating and maintaining free public elementary and secondary schools violates article first, §§ 1 and 20, and article eighth, § 1, of the Connecticut Constitution."

The defendants' fourth assignment of error is that the trial court erred in failing to conclude that only two statutory sections, namely §§ 10-240 and 10-241, which provide the system for financing education, are unconstitutional. The fifth assignment claims that the trial court erred in overruling the defendants' claims of law which are substantially similar in subject but opposite in result to the conclusions of law claimed as error in the third assignment.

Before turning to a consideration of the assignments of error addressed to the merits of the

appeal, we turn first to the question of the jurisdiction of the trial court to act in these cases. This issue was raised by the defendants' pleas of sovereign immunity which the trial court concluded were not valid defenses to these actions.

In Connecticut, we have long recognized the validity of the common-law principle that the state cannot be sued without its consent and that since the state can act only through its officers and agents a suit against a state officer is in effect one against the sovereign state. *Textron, Inc.* v. *Wood,* 167 Conn. 334, 339, 355 A.2d 307; *Fidelity Bank* v. *State,* 166 Conn. 251, 253, 348 A.2d 633; *Baker* v. *Ives,* 162 Conn. 295, 298, 294 A.2d 290; *State* v. *Kilburn,* 81 Conn. 9, 11, 69 A. 1028. This rule had its origin in the ancient common law, predicated on the principle that the king, being the fountainhead of justice, could not be sued in his own courts. 1 Pollack & Maitland, History of English Law (2d Ed.) pp. 514–18. While the principle of sovereign immunity is deeply rooted in our common law, it has, nevertheless, been modified and adapted to the American concept of constitutional government where the source of governmental power and authority is not vested by divine right in a ruler but rests in the people themselves who have adopted constitutions creating governments with defined and limited powers and courts to interpret these basic laws. The source of the sovereign power of the state is now the constitution which created it, and it is now recognized that, as Mr. Justice Holmes wrote: "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." *Kawa-*

*nanakoa* v. *Polyblank,* 205 U.S. 349, 353, 27 S. Ct. 526, 51 L. Ed. 834; see *Bergner* v. *State,* 144 Conn. 282, 285, 130 A.2d 293.

The practical and logical basis of the doctrine is today recognized to rest on this principle and on the hazard "that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds, and property." Block, "Suits against Government Officers and the Sovereign Immunity Doctrine," 59 Harv. L. Rev. 1060, 1061. As the author of that article makes clear, adherence to the doctrine of sovereign immunity does not mean that all suits against government officers, since they are in effect suits against the government, must be barred. As he suggests (p. 1080): "In those cases in which it is alleged that the defendant officer is proceeding under an unconstitutional statute or in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine. Moreover, the government cannot justifiably claim interference with its functions when the acts complained of are unconstitutional or unauthorized by statute. On the other hand, where no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction." This court expressly approved this principle in *Simmons* v. *Parizek,* 158 Conn. 304, 307, 259 A.2d 642, which was an action against a state commission which was alleged to have taken prop-

erty without constitutional or statutory authority. While noting (p. 306) that "this suit is clearly one against the state," the court held that it was not barred by the defense of sovereign immunity, stating (p. 307): "It does not necessarily follow, however, that every action in which state officials or members of state agencies are named defendants and designated by official titles should be treated as an action against the state such as to clothe the defendants with immunity from suit. Sovereign immunity does not protect state officials from suits to recover property taken or held in violation of the constitution or without statutory authority, even though the property is held in the name of the state of Connecticut. . . . State officials cannot therefore shield themselves with sovereign immunity if a party alleges and proves that they took or retained his real property in a manner which was either unconstitutional or unauthorized by statute."

Recognizing the distinction between sovereign immunity from suit and sovereign immunity from liability; see *Bergner* v. *State,* supra; and the judicial duty under a constitutional government such as ours to decide a justiciable controversy as to the constitutionality of a legislative enactment; *Szarwak* v. *Warden,* 167 Conn. 10, 27, 355 A.2d 49; *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137, 177–78, 2 L. Ed. 60; we have many times in the past considered the merits of appeals from judgments in declaratory judgment actions when state officials have been parties. See *Gentile* v. *Altermatt,* 169 Conn. 267, 363 A.2d 1 (concerning the constitutionality of the no-fault automobile insurance act); *Lublin* v. *Brown,* 168 Conn. 212, 362 A2d 769 (concerning the constitutionality of the occupational tax levied on attorneys); *Thibeault* v. *White,* 168 Conn.

112, 358 A.2d 358 (concerning the interpretation of a public assistance statute); *Textron, Inc.* v. *Wood,* 167 Conn. 334, 355 A.2d 307 (concerning the constitutional taking of property); *Bridgeport* v. *Agostinelli,* 163 Conn. 537, 316 A.2d 371 (concerning the rights of cities and towns to proportionate shares of legislative appropriations for educational purposes); *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 291 A.2d 721 (concerning the respective powers of two state regulatory commissions); *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49 (concerning the constitutionality of an act providing for the administration of the Probate Court system); *Knights of Columbus Council No. 3884* v. *Mulcahy,* 154 Conn. 583, 227 A.2d 413 (concerning the constitutionality of a statute regarding the playing of bingo); *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 217 A.2d 698 (concerning the constitutionality of an act regarding the establishment of rates of insurance); *Spector Motor Service, Inc.* v. *Walsh,* 135 Conn. 37, 61 A.2d 89 (concerning the validity and construction of the 1935 corporation business tax); *Lyman* v. *Adorno,* 133 Conn. 511, 52 A.2d 702 (concerning the constitutionality of a bonus to veterans).

The declaratory judgment procedure in Connecticut as provided by § 52-29 of the General Statutes and §§ 307—313 of the Practice Book is peculiarly well adapted to the judicial determination of controversies concerning constitutional rights and, as in these cases, the constitutionality of state legislative or executive action. As we have observed, "[t]he statute authorizing the Superior Court to render declaratory judgments is as broad as it well could be made." *Sigal* v. *Wise,* 114 Conn. 297, 301, 158 A. 891. It antedated the Uniform Declaratory

Judgments Act, it is broader in scope than that act and the statutes in most, if not all, other jurisdictions; *Spector Motor Service, Inc.* v. *Walsh,* supra; and "[w]e have consistently construed our statute and the rules under it in a liberal spirit, in the belief that they serve a sound social purpose." *Connecticut Savings Bank* v. *First National Bank & Trust Co.,* 133 Conn. 403, 409, 51 A.2d 907. While the declaratory judgment procedure may not be utilized merely to secure advice on the law; *Tellier* v. *Zarnowski,* 157 Conn. 370, 373, 254 A.2d 568; or to establish abstract principles of law; *Norwalk Teachers' Assn.* v. *Board of Education,* 138 Conn. 269, 272, 83 A.2d 482; or to secure the construction of a statute if the effect of that construction will not affect a plaintiff's personal rights; *Gannon* v. *Sanders,* 157 Conn. 1, 9, 244 A.2d 397; it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof. Practice Book § 309. The procedure has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances. In a case such as the present one, this circumstance is of special importance because the court, mindful of the proper limitations on judicial intervention, the problems inherent in the complexities of school financing and the presumption that the other departments of our government will accede to this court's interpretation of the state constitution, may prop-

erly delay specific direction, affording time for corrective action and avoiding any "serious interference with the performance of their functions and with their control over their respective instrumentalities, funds, and property." Block, "Suits against Government Officers and the Sovereign Immunity Doctrine," 59 Harv. L. Rev. 1060, 1061.

We conclude that the trial court was not in error in holding that sovereign immunity was not an available defense to the present actions. A holding to the contrary would foreclose proper judicial determination of a significant and substantial constitutional question the determination of which is manifestly in the public interest.

We turn now to the assignments of error addressed to the court's finding of facts. The finding consists of a total of 169 paragraphs of which 142 paragraphs are findings of fact. In addition, 37 exhibits are expressly incorporated into and made part of the finding. Although the defendants have assigned error in the court's refusal to find certain facts and in its finding certain others without evidence to support them, the plaintiffs' meticulously briefed support for the finding discloses that it is not subject to any material correction.

Without attempting to recite in detail the lengthy finding of facts, we note certain findings which are of special significance. The public schools in Canton, like those of all other towns in the state, are financed primarily by two means: funds raised by the town by assessment on property within the town and funds distributed by the state pursuant to legislation providing for a flat grant depending on the average number of pupils attending school daily. This grant is usually referred to as the ADM (average daily membership) grant. General Stat-

utes § 10-262. The ADM grant paid during 1973-74 was $215 per pupil and has since been increased to $250 per pupil. It has been the principal source of the state's contribution to local public school education for about three decades though, by statute, the state provides for various other grant payments to each town or district for public and nonpublic school programs and activities. These include grants for exceptional and handicapped students, General Statutes § 10-76a—10-76g; for school construction, § 10-286; and for student transportation, §§ 10-266, 10-273a and 10-277.

In Connecticut, the percentage contribution of the local, state, and federal governments has been approximately 70 percent local, 20 to 25 percent state, and 5 percent or less federal. This contrasts with the average figures nationally of 51 percent local, 41 percent state, and 8 percent federal. Financing Connecticut's Schools, Final Report of the Commission to Study School Finance and Equal Educational Opportunity, p. 1. Funds raised by local governments for local public school education come principally from one source—the local property tax. For the year 1972-73, 80.1 percent of the state aid for local public school operating expenses was distributed as a flat grant that was not based upon the ability of the towns to finance education, 12.6 percent came from the reimbursement grant for special education, and 7.3 percent came from twelve miscellaneous grants, none of which was distributed on the basis of a town's ability to finance education.

The total average statewide per pupil expenditure as reported by the state board of education for the year 1972-73 was $1091. The comparable figure reported by the Connecticut Public Expendi-

630

ture Council was $1054.70. The discrepancy is attributable to the inclusion of tuition paid to non-public schools for children requiring special education and the transportation payments by the state board of education.

Because local property taxes are the principal source of revenue for local public schools, a significant measure of the ability of the various towns to finance local education is the dollar amount of taxable property per pupil in each town which can be figured by dividing the grand list of a town by the number of pupils.[10] For the 1972-73 school year, wide disparities existed in the effective yield per pupil ranging from approximately $20,000 per pupil to approximately $170,000 per pupil. During that year, the state average was $53,639. In Canton, it was $38,415.

[10] "Mill rate is the term Connecticut towns use to indicate the local property tax rate. The mill rate indicates how many property tax dollars are paid for each $1000 of assessed valuation. For example, a mill rate of 16.35 mills means that a taxpayer pays $16.35 for each $1000 of his total assessed valuation." Financing Connecticut's Schools, Final Report of the Commission to Study School Finance and Equal Educational Opportunity, Glossary, p. 32.

Finding 31 of the trial court uses the following definitions:

" 'Net Mill Rate' equals the stated mill rate of a town adjusted by the 'Percent Valuation' and the 'Reevaluation Factor' so that the mill rate for each town can be stated in terms of the fair market value of property for a given year."

"(a) 'Net Grand List' means the assessed value of all taxable property, less exemptions, in a town. (b) 'Percent Valuation' means the town's uniform percentage of assessed valuation to fair market value as of the date of reevaluation. (c) '100% Grand List' equals the 'Net Grand List' divided by the 'Percent Valuation.' (d) 'Reevaluation Factor' is the percentage by which each '100% Grand List' must be adjusted so that each '100% Grand List' will reflect fair market value for the same year. (e) 'Equalized Grand List' means the 'Net Grand List' adjusted by the 'Percent Valuation' and the 'Reevaluation Factor' so that the grand lists of all towns will reflect fair market value for the same year. . . . 'Equalized Grand List' is called 'Current Value of Taxable Grand List.' "

The general tax effort of a town may be measured by determining the net mill rate. Sample net mill rates for the school year 1972-73 were: Cornwall, 10.8 mills; Greenwich, 15.5 mills; Darien, 20.5 mills; Weston, 23.4 mills; West Hartford, 28.0 mills; Canton, 30.0 mills; Chaplin, 49.2 mills. The state average was 25.7 mills. For the 1972-73 school year, the average percentage of the local property tax spent on education by all towns was 57 percent; the percentage spent by Canton was 73 percent.

The tax effort of a town to finance education may be measured by determining the net school mill rate which is that part of the net mill rate which a town spends on education. Sample net school mill rates for the school year 1972-73 were: Greenwich, 7.0 mills; Cornwall, 7.8 mills; Darien, 14.6 mills; West Hartford, 16.2 mills; Weston, 19.4 mills; Canton, 21.9 mills; Chaplin, 37.4 mills. The state average was 14.6 mills. A comparison between property-rich and property-poor towns, ranking all towns in Connecticut by yields per pupil and dividing the towns into deciles, shows the following relationship between yield per pupil, per pupil operation expenditures, and net school mill rate for the 1972-73 school year:

| Decile | Yield Per Pupil Range | Yield Per Pupil Average | Per Pupil Operating Expenditures Average | Net School Mill Rate (Mills Allocated To Schools) Average |
|---|---|---|---|---|
| 1 | $170,434-82,328 | $102,901 | $1245 | 11.1 |
| 2 | 80,129-71,192 | 75,785 | 1115 | 13.1 |
| 3 | 71,170-62,424 | 66,182 | 1110 | 15.5 |
| 4 | 61,270-55,150 | 58,090 | 1030 | 15.7 |
| 5 | 54,605-50,347 | 52,651 | 958 | 15.4 |
| 6 | 50,297-44,207 | 47,335 | 899 | 16.3 |
| 7 | 44,140-39,471 | 41,495 | 908 | 19.1 |
| 8* | 39,101-33,623 | 36,134 | 877 | 20.6 |
| 9 | 33,481-28,751 | 31,724 | 889 | 22.1 |
| 10 | 28,615-19,842 | 25,474 | 813 | 26.3 |

* Canton

Of these relationships, a few are key: although the average per pupil operating expenditures of eighth-decile towns are 30 percent less than the average per pupil operating expenditures of first-decile towns, the average net school mill rate of eighth-decile towns is almost twice that of first-decile towns; although the average per pupil operating expenditures of tenth-decile towns are 35 percent less than the average per pupil operating expenditures of first-decile towns, the average net school mill rate of tenth-decile towns is almost two and one-half times that of first decile towns. The net school mill rate of Canton is higher than the net school mill rate of Darien, Greenwich, West Hartford, and Weston, but the per pupil operating expenditures of Canton are substantially lower. Greenwich's net school mill rate is less than 33 percent of Canton's, but Greenwich's per pupil operating expenditures are slightly more than 50 percent higher than Canton's.

In sum, taxpayers in property-poor towns such as Canton pay higher tax rates for education than taxpayers in property-rich towns. The higher tax rates generate tax revenues in comparatively small amounts and property-poor towns cannot afford to spend for the education of their pupils, on a per pupil basis, the same amounts that property-rich towns do. These facts were affirmed by a conclusion of the governor's commission on tax reform: "In short, many towns can tax far less and spend much more; and those less fortunate towns can never catch up in school expenditure because taxes are already as high as homeowners can toler-

ate. . . . This dual inequity—a family can pay more and get less for its children—is the fundamental issue of school finance." 2 Governor's Commission on Tax Reform, Local Government—Schools and Property, pp. 53-54.

The wide disparities that exist in the amount spent on education by the various towns result primarily from the wide disparities that exist in the taxable wealth of the various towns; the present system of financing education in Connecticut ensures that, regardless of the educational needs or wants of children, more educational dollars will be allotted to children who live in property-rich towns than to children who live in property-poor towns.

In the 1972-73 school year, the per pupil operating expenses of sample towns were as follows: Darien, $1570.47; West Hartford, $1443.10; Greenwich, $1428.99; Weston, $1332.79; Canton, $945.15; Lisbon, $669.94. The state average was $1054.70. Property-rich towns were and still are able, through higher per pupil expenditures, to provide a substantially wider range and higher quality of educational services than Canton in the areas of course offerings, special education, learning disability teachers and facilities, library resources, television teaching, and in numerous other areas, including higher ratios of classroom teachers to students, specialist teachers to students, guidance counselors to students, and other similar relationships. Because of the two-thirds reimbursement provision of the state aid statute for special education, towns that spend more on special education

receive more state aid than towns that spend less. This is illustrated by the following chart:

| | Student Body | Special Education Aid from State | State Aid per Student |
|---|---|---|---|
| Canton | 1,814 | $ 34,476 | $ 19.00 |
| West Hartford | 11,991 | 486,804 | 40.60 |
| Weston | 2,482 | 64,160 | 25.85 |
| Darien | 5,103 | 304,140 | 59.60 |
| All Districts | 664,933 | 22,680,000 | 34.11 |

High education-spending towns, such as Darien, were and are able to obtain more special education funds from the state because they are better able to afford the one-third portion of the expense, better equipped to identify special education problems and better staffed to apply for funds.

An important factor in determining what school system a teacher chooses to teach in is the school's salary scale. Although over 80 percent of Canton's educational budget goes to teachers' salaries, in 1973-74, Canton's average teacher salary was $10,830 compared with $14,175 in West Hartford. Top salary comparisons were $14,990 and $19,140, respectively. Towns with fewer tax resources such as Canton tend to have a higher percentage of inexperienced teachers, especially teachers with only one year of experience or less.

The criteria for evaluating the "quality of education" in a town include the following: (a) size of classes; (b) training, experience and background of teaching staff; (c) materials, books and supplies; (d) school philosophy and objectives; (e) type of local control; (f) test scores as measured against ability; (g) degree of motivation and application of the students; (h) course offerings and extracurricular activities. In most cases, the optimal version of these criteria is achieved by higher per

pupil operating expenditures, and because many of the elements of a quality education require higher per pupil operating expenditures, there is a direct relationship between per pupil school expenditures and the breadth and quality of educational programs.

Further findings by the trial court were addressed to consideration of possible means of achieving equality of educational opportunities with further consideration given to the variations in types of education and other variables that may affect the educational program and its cost. It found that equalizing the ability of the various towns to finance education would provide all towns, property-poor and property-rich, with the opportunity to exercise a meaningful choice as to educational services to be offered to students. It found that at the time of trial Connecticut ranked fiftieth among the states in its efforts to distribute aid in such a way as to equalize the abilities of the various towns to finance education, ranked forty-seventh in the percent of educational funding coming from the state and second in the percent of education funding coming from local governments, and that of all the existing forms of distributing state funds used throughout the country, the flat grant has the least equalizing effect on local financial abilities.

It further found that substantial progress can be made toward equalizing the financial abilities of the local districts by redistributing the flat grant funds according to a different formula, which can be accomplished without the need for additional state taxes; that equalizing the ability of the various towns to finance education would not require that all towns spend the same amount for the education of each pupil since towns can be left free to choose the

level of expenditures appropriate for their circumstances; and that there is no reason why local control needs to be diminished in any degree merely because some financing system other than the present one is adopted.

In its finding and by supplemental judgments dated August 8, 1975, the court took cognizance of legislation passed by the 1975 session of the General Assembly which increased the state's flat grant from $215 per pupil to $250 per pupil and provided for "Special Instant Lottery Games" the net proceeds of which were to be used "solely for educational equalization grants to towns"; Public Acts 1975, No. 75-344; and distributed in accordance with Public Acts 1975, No. 75-341, "An Act Establishing a Guaranteed Tax Base Program to Finance Public Elementary and Secondary Education."[11] The court

[11] Public Acts 1975, No. 75-341 § 2 (a) prescribed the following formula for computing the grants from lottery funds: "Each town maintaining schools according to law whose adjusted equalized net grand list per capita falls at or below the eighty-fifth percentile among all towns in the state, as determined by ranking in ascending order all towns in the state according to their adjusted equalized net grand lists per capita, shall be paid a grant, except as provided in subsection (b) or (c) of this section, in an amount equal to the product of (1) the school tax rate times (2) the difference between the adjusted equalized net grand list per capita for the town at the eighty-fifth percentile and the adjusted equalized net grand list per capita for the town, times (3) the population of the town."

Section 2 (b) of the act limited the total grant to any town to an amount not to exceed "five per cent of the total grant per pupil in average daily membership received by such town pursuant to section 10-262 of the general statutes."

We note that in the 1976 session of the General Assembly the permissible grant from the lottery proceeds was increased from 5 percent to 7 3/10 percent but the source of the funds was still limited to the proceeds of the instant lottery games and a restriction was continued that in the event that these funds proved insufficient, each town entitled to a grant should be paid an amount equal to its proportionate share of the gambling proceeds. General Statutes § 10-262c (c) (Rev. to 1977).

found that the $35 per pupil increase in the flat grant has little, if any, effect on equalizing the ability of the various towns to finance education, and that although the instant lottery legislation would provide an additional grant of $12.50 per pupil per year to those towns which fall in the bottom eighty-fifth percentile of all Connecticut towns ranked according to property-taxable wealth and median family income, the effect of the additional lottery fund grant on equalizing the ability of Canton and other property-poor towns to finance education "will be miniscule and not significant."

Two further findings of the trial court were the following: "The State Board of Education has consultants available who concern themselves with assisting local boards of education in maintaining the statutorily-mandated minimum quality of education," and "Canton is providing the basic elementary and secondary education required by statute."

It was on the basis of the foregoing finding of facts that the trial court reached the conclusions which are the subject of the defendants' third assignment of error. These conclusions were (in addition to the conclusion that the doctrine of sovereign immunity was not a defense to this action, which ruling we have already discussed) that education is a fundamental right under the Connecticut constitution; that the state system of financing education is an interference with the "fundamental right" to education and therefore requires "strict judicial scrutiny"; that §§ 10-240 and 10-241 of the General Statutes are violative of the equal rights and equal protection of the laws provisions of the constitution of Connecticut, article first, §§ 1 and 20, and of article eighth, § 1, and they are not appro-

priate legislation within the purview of article eighth, § 1; that variations in money available to different towns produce variations in quality of instruction; that the financing system discriminates against pupils in Canton because the breadth and quality of the education they receive is to a substantial degree narrower and lower than that which pupils receive in comparable towns with larger tax bases and a greater ability to finance education; that that narrower breadth and lower quality of education is a result of the state's delegation of its responsibilities without regard to Canton's financial capabilities; that the present financing system is not appropriate legislation to discharge the state's constitutional duty to educate its students and, therefore, the system, beyond a reasonable doubt, violates the constitution of Connecticut, article eighth, § 1; that although local control of public schools is a legitimate state objective, since local control of education need not be diminished if the ability of towns to finance education is equalized, the local control objective is not a rational basis for retention of the present financing system; that the state has not selected the less drastic means for effectuating the local control objective and, therefore, the system, beyond a reasonable doubt, violates the constitution of Connecticut, article first, §§ 1 and 20; that Canton's reliance on real property taxes as the principal source of its funds for providing public school education has not been diminished in any legally significant degree by Public Acts 1975, No. 75-341; that Public Acts 1975, No. 75-341 provided no basis for modifying the court's earlier announced decision that §§ 10-240 and 10-241 of the General Statutes are violative of the constitution of Connecticut, article first, §§ 1 and 20, and article eighth, § 1.

The conclusions of the trial court are tested by the finding. *Roby* v. *Connecticut General Life Ins. Co.,* 166 Conn. 395, 397, 349 A.2d 838; *Brauer* v. *Freccia,* 159 Conn. 289, 293, 268 A.2d 645. "A finding is to be read to uphold the judgment. Every reasonable presumption will be indulged in to support it." Maltbie, Conn. App. Proc. § 135. The conclusions reached by the trial court must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. *Klein* v. *Chatfield,* 166 Conn. 76, 80, 347 A.2d 58; *Johnston Jewels, Ltd.* v. *Leonard,* 156 Conn. 75, 79, 239 A.2d 500; *Craig* v. *Dunleavy,* 154 Conn. 100, 105, 221 A.2d 855.

Since many of the conclusions of the court are interdependent, it is unnecessary to consider them seriatim. Obviously the most significant ones are those dealing with constitutional interpretation, and the tests applicable to that interpretation, generally, and to the equal rights and equal protection provisions, specifically.

This court has many times noted that the equal protection clauses of the state and federal constitutions have a like meaning and impose similar constitutional limitations. *State* v. *Rao,* 171 Conn. 600, 370 A.2d 1310; *Kellems* v. *Brown,* 163 Conn. 478, 485, 313 A.2d 53, appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678; *Snyder* v. *Newtown,* 147 Conn. 374, 381, 161 A.2d 770, appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688; *Lyman* v. *Adorno,* 133 Conn. 511, 515, 52 A.2d 702; *State ex rel. Brush* v. *Sixth Taxing District,* 104 Conn. 192, 195, 132 A. 561. In *State* v. *Rao,* supra, we reiterated (p. 602) the controlling principles of law as enunciated by the United States

Supreme Court: "Equal protection analysis must commence with a determination of whether a legislative classification . . . impinges upon a fundamental right. Where the legislation impinges upon a fundamental right . . . it must be struck down unless justified by a compelling state interest. *Dunn* v. *Blumstein,* 405 U.S. 330, 335, 342, 92 S. Ct. 995, 31 L. Ed. 2d 274. Where the statute does not involve fundamental rights . . . the legislation will withstand constitutional attack if the distinction is founded on a rational basis." See *Liistro* v. *Robinson,* 170 Conn. 116, 124, 365 A.2d 109; *Laden* v. *Warden,* 169 Conn. 540, 542, 363 A.2d 1063. In *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16, the United States Supreme Court reaffirmed its application of the two standards of judicial review under the equal protection clause of the federal constitution: (1) the strict scrutiny test, where, once unequal treatment is demonstrated, the state must show a compelling state interest for the unequal treatment; and (2) the rational basis test, where, once unequal treatment is demonstrated, the complaining party must show that the legislation in question does not have a rational basis.

In the *Rodriguez* case, the United States Supreme Court adopted what appears to be a special test for determining whether education is a fundamental constitutional right: "[T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the

Constitution." *San Antonio Independent School District* v. *Rodriguez,* supra, 33. The court concluded that no such right was guaranteed by the federal constitution and, accordingly, declined to apply a strict scrutiny test.

Parenthetically, it is pertinent to note some of the criticism of the application of the test of fundamentality as determined by the existence of an explicit or implicit constitutional guarantee. See the dissenting opinion by Mr. Justice Marshall in *San Antonio Independent School District* v. *Rodriguez,* supra, 100; *Robinson* v. *Cahill,* 62 N.J. 473, 491, 303 A.2d 273, cert. denied, sub nom. *Dickey* v. *Robinson,* 414 U.S. 976, 94 S. Ct. 292, 38 L. Ed. 2d 219; *Serrano* v. *Priest,* 18 Cal. 3d 728, 767, 557 P.2d 929 (*Serrano II*); *Thompson* v. *Engelking,* 96 Idaho 793, 804, 537 P.2d 635.

The *Rodriguez* case is very relevant to the appeal before us. The equal protection clauses of both the United States and Connecticut constitutions having a like meaning, the decisions of the United States Supreme Court defining federal constitutional rights are, at the least, persuasive authority, although we fully recognize the primary independent vitality of the provisions of our own constitution. Paraphrasing the language of the California Supreme Court in *People* v. *Longwill,* 14 Cal. 3d 943, 951 n.4, 538 P.2d 753: In the area of fundamental civil liberties —which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connect-

icut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law.

In the *Rodriguez* case, the United States Supreme Court was called upon to review the financing system for education used in Texas, which system had been attacked as violating the equal protection clause of the federal constitution. Although there are significant differences between the Texas system and the Connecticut system, they are alike in that a substantial quantum of educational support is supplied by local districts with disparities in financial resources for the furnishing of such support. The trial court in the present cases observed: "[T]hose differences do not, in the opinion of this court, make inapplicable to the Connecticut system the reasons why the Texas system was held not to violate the United States Constitution." We agree with that conclusion.

The *Rodriguez* decision was a 5 to 4 decision, and although the majority holding was that the Texas education-financing system did not violate the equal protection provisions of the federal constitution, the language of the majority opinion and the strength of the dissenting opinions have had great impact on state education-financing systems.[12] Not the least significant caveats expressed in the

---

[12] "Since the Court's decision in *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16, nineteen states have passed major legislative reforms to their systems for financing public education. Eleven of these states revised their systems for distributing state aid by enacting a form of district

majority opinion were the observations (p. 40) that the appellees in that case "would have the Court intrude in an area in which it has traditionally deferred to state legislatures," the acknowledgement (p. 41) that the justices of that court "lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues," and the court's expressed concern (p. 44) for the relationship between national and state power under our federal system—"it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State."

Two other observations in the *Rodriguez* majority opinion have also obviously had their effect on state action to provide more uniform educational opportunity. The first is the reaffirmation of the statements made in *Brown* v. *Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873, that "education is perhaps the most important function of state and local governments" and "[i]n these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." The other observation is the concluding paragraph of the majority opinion in *Rodriguez* in which the court stated (p. 58) as "a cautionary postscript":

power-equalizing formulas. The remaining eight expanded their state foundation programs to assume a greater percentage of the state's educational expenditures." Lindquist & Wise, "Developments in Education Litigation: Equal Protection," 5 J. Law & Ed., No. 1, pp. 1, 22.

"The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States, and we do no violence to the values of federalism and separation of powers by staying our hand. We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them."

In our consideration of the merits of the present appeals, we have not found material aid in the many decisions from the courts of other jurisdictions since most of them depend upon the controlling and differing provisions of the constitutions in the particular jurisdictions.[13] Nor have we found the *Rodriguez*

[13] For a listing of these cases and a discussion of many of them as of January, 1976, see Lindquist & Wise, "Developments in Education Litigation: Equal Protection," 5 J. Law & Ed. 1, 3 n.11. In December, 1976, the system of financing public schools was upheld in Oregon in *Olsen* v. *Oregon*, 276 Ore. 9, 554 P.2d 139. A system of equalizing district expenditures on education was, in November, 1976, held unconstitutional in Wisconsin in *Buse* v. *Smith*, Wis. 2d , N.W.2d ; new legislation to meet the constitutional standard for educational expenditures established in *Serrano* v. *Priest*, 5 Cal. 3d 584, 487 P.2d 1241 (*Serrano I*), was ruled invalid in *Serrano* v. *Priest*, 18 Cal. 3d 728, 557 P.2d 929 (*Serrano II*); and the level of state funding as it relates to one district was, in January, 1977, ruled unconstitutional by a Washington trial court in *Washington* v. *State*, Wash. 2d , P.2d .

test for the fundamentality of the right to an education of particular help—although under that test it cannot be questioned but that in the light of the Connecticut constitutional recognition of the right to education (article eighth, § 1) it is, in Connecticut, a "fundamental" right.

As other courts have recognized, educational equalization cases are "in significant aspects sui generis" and not subject to analysis by accepted conventional tests or the application of mechanical standards. The wealth discrimination found among school districts differs materially from the usual equal protection case where a fairly defined indigent class suffers discrimination to its peculiar disadvantage. The discrimination is relative rather than absolute. Further, the children living in towns with relatively low assessable property values are afforded public education but, as the trial court found, the education they receive is to a substantial degree narrower and lower in quality than that which pupils receive in comparable towns with a larger tax base and greater ability to finance education. True, the state has mandated local provision for a basic educational program with local option for a program of higher quality but, as the trial court's finding indicates, that option to a town which lacks the resources to implement the higher quality educational program which it desires and which is available to property-richer towns is highly illusory. As Mr. Justice Marshall put it in his dissent in *Rodriguez* (p. 89) : "[T]his Court has never suggested that because some 'adequate' level of benefits is provided to all, discrimination in the provision of services is therefore constitutionally excusable. The Equal Protection Clause is not addressed to the minimal sufficiency but rather to the unjustifiable

inequalities of state action. It mandates nothing less than that 'all persons similarly circumstanced shall be treated alike.' *F. S. Royster Guano Co.* v. *Virginia*, 253 U.S. 412, 415 (1920) [40 S. Ct. 560, 64 L. Ed. 989]." With justification, the trial court found merit to the complaints of the plaintiffs about "the sheer irrationality" of the state's system of financing education in the state on the basis of property values, noting that their argument " 'would be similar and no less tenable should the state make educational expenditures dependent upon some other irrelevant factor, such as the number of telephone poles in the district.' Note . . . ["A Statistical Analysis of the School Finance Decisions: On Winning Battles and Losing Wars," 81 Yale L.J. 1303, 1307]."

We find our thinking to be substantially in accord with the decisions of the New Jersey Supreme Court in *Robinson* v. *Cahill*, 62 N.J. 473, 303 A.2d 273, and the California Supreme Court in *Serrano* v. *Priest*, 18 Cal. 3d 728, 557 P.2d 929 (*Serrano II*), and whether we apply the "fundamentality" test adopted by *Rodriguez* or the pre-*Rodriguez* test under our state constitution (as the California Supreme Court did in *Serrano II*) or the "arbitrary" test applied by the New Jersey Supreme Court in *Robinson* v. *Cahill*, supra, 492,[14] we must conclude that in Connecticut the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized.

---

[14] "Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial." *Robinson* v. *Cahill*, 62 N.J. 473, 492, 303 A.2d 273.

"Connecticut has for centuries recognized it as her right and duty to provide for the proper education of the young." *State ex rel. Huntington* v. *Huntington School Committee,* 82 Conn. 563, 566, 74 A. 882. Education is so important that the state has made it compulsory through a requirement of attendance. General Statutes § 10-184. As early as 1650, the General Court (as the General Assembly was then called) adopted a provision that "euery Towneshipp within this Jurissdiction, after the Lord hath increased them to the number of fifty houshoulders, shall then forthwith appoint one within theire Towne to teach all such children as shall resorte to him, to write and read . . . . And it is further ordered, that where any Towne shall increase to the number of one hundred families or housholders, they shall sett vp a Grammer Schoole, the masters thereof being able to instruct youths so farr as they may bee fitted for the Vniversity." 1 Col. Rec. 555. This same basic educational system has continued to this date, the state recognizing that providing for education is a state duty and function now codified in the constitution, article eighth, § 1, with the obligation of overseeing education on the local level delegated to local school boards which serve as agents of the state. *Murphy* v. *Berlin Board of Education,* 167 Conn. 368, 372, 355 A.2d 265; *West Hartford Education Assn., Inc.* v. *DeCourcy,* 162 Conn. 566, 573, 295 A.2d 526. The General Assembly has by word, if not by deed, recognized in the enactment of § 10-4a of the General Statutes (see footnote 9, supra) that it is the concern of the state that "each child shall have . . . equal opportunity to receive a suitable program of educational experiences." Indeed the concept of equality is expressly embodied in the constitutional

648

provision for distribution of the school fund in the provision (article eighth, § 4) that the fund "shall be inviolably appropriated to the support and encouragement of the public schools throughout the state, and for the equal benefit of all the people thereof."

The present-day problem arises from the circumstance that over the years there has arisen a great disparity in the ability of local communities to finance local education, which has given rise to a consequent significant disparity in the quality of education available to the youth of the state. It was well stated in the memorandum of decision of the trial court, which noted that the "present method [of financing education in the state] is the result of legislation in which the state delegates to municipalities of disparate financial capability the state's duty of raising funds for operating public schools within that municipality. That legislation gives no consideration to the financial capability of the municipality to raise funds sufficient to discharge another duty delegated to the municipality by the state, that of educating the children within that municipality. The evidence in this case is that, as a result of this duty-delegating to Canton without regard to Canton's financial capabilities, pupils in Canton receive an education that is in a substantial degree lower in both breadth and quality than that received by pupils in municipalities with a greater financial capability, even though there is no difference between the constitutional duty of the state to the children in Canton and the constitutional duty of the state to the children in other towns."

We conclude that without doubt the trial court correctly held that, in Connecticut, elementary and secondary education is a fundamental right, that

pupils in the public schools are entitled to the equal enjoyment of that right, and that the state system of financing public elementary and secondary education as it presently exists and operates cannot pass the test of "strict judicial scrutiny" as to its constitutionality. These were the basic legal conclusions reached by the court. The remaining conclusions arise from the application of these legal principles to the facts which the court found. These we have already summarized and it is unnecessary to repeat them. It suffices to note that the exhaustive finding of facts amply supports the conclusions of the court that the present legislation enacted by the General Assembly to discharge the state's constitutional duty to educate its children, depending, as it does, primarily on a local property tax base without regard to the disparity in the financial ability of the towns to finance an educational program and with no significant equalizing state support, is not "appropriate legislation" (article eighth, § 1) to implement the requirement that the state provide a substantially equal educational opportunity to its youth in its free public elementary and secondary schools.

The cross appeal of the plaintiffs requires but brief mention. Their sole assignment of error is that the trial court erred in failing to rule that the state's present system of financing public education violates the equal protection clause of the fourteenth amendment to the constitution of the United States. In fact, the trial court expressly concluded that it did not. In the light of the decision of the United States Supreme Court in the *Rodriguez* case and the court's finding in the present case, it is extremely doubtful that error could be found in the trial court's conclusion. The United States

Supreme Court provides the ultimate definitions of the United States Constitution. *Cooper* v. *Aaron,* 358 U.S. 1, 78 S. Ct. 1401, 3 L. Ed. 2d 5. It is, however, unnecessary to extend this opinion for a discussion of what is essentially an academic question. We have found no error in the court's conclusion that the present legislative provisions for financing education in the state violate the provisions of the Connecticut constitution. That suffices.

In reaching our conclusion, we have not overlooked the precept that "[w]hen the constitutionality of legislation is in question, it is the duty of the court to sustain it unless its invalidity is beyond a reasonable doubt." *Amsel* v. *Brooks,* 141 Conn. 288, 294, 106 A.2d 152, appeal dismissed, 348 U.S. 880, 75 S. Ct. 125, 99 L. Ed. 693; *Lublin* v. *Brown,* 168 Conn. 212, 220, 362 A.2d 769; *Kellems* v. *Brown,* 163 Conn. 478, 487, 313 A.2d 53. With full consideration of that presumption, we have, nevertheless, reached our conclusion that there was no error in the judgments of the trial court.

Under the circumstances of this case, it is not inappropriate to comment on the question of what relief may properly be afforded to the plaintiffs. As we have noted, the trial court limited its judgments to declaratory ones while retaining jurisdiction for consideration of the granting of any consequential relief. In so doing, it quoted with approval from the portion of the *Rodriguez* decision which observed (p. 59) that "the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them." This observation is doubly appropriate. While "[i]t is emphatically the province and duty of the judicial department to say what the law is"; *United*

*States* v. *Nixon*, 418 U.S. 683, 703, 94 S. Ct. 3090, 41 L. Ed. 2d 1039; the fashioning of a constitutional system for financing elementary and secondary education in the state is not only the proper function of the legislative department but its expressly mandated duty under the provisions of the constitution of Connecticut, article eighth, § 1. The judicial department properly stays its hand to give the legislative department an opportunity to act. Various means of achieving substantial equality of opportunities for learning have been adopted and are in operation in many other states.[15]

While the development of an appropriate legislative plan is not without its complexities, the problem is not insoluble. Nor do we share the alarm expressed in the dissenting opinion at what it concludes are "the implications of the decision" as requiring total state financing of education, loss of local administrative control over educational decisions and the requirement that education in all towns "be brought up to the Darien standard" which, if it occurred, the trial court found would require an increase of $313,000,000 over the amounts being currently expended. To the contrary, as we have noted, the trial court expressly found that none of these consequences would of necessity follow the adoption by the state of a financing program designed to achieve a substantial degree of equality of educational opportunity and permit all towns to

---

[15] See Coons, Clune & Sugarman, "Educational Opportunity: A Workable Constitutional Test for State Financial Structures," 57 Cal. L. Rev. 305; comment, "The Evolution of Equal Protection: Education, Municipal Services, and Wealth," 7 Harv. Civ. Rights-Civ. Lib. L. Rev. 105, 187; Michelson, "What is a 'Just' System for Financing Schools? An Evaluation of Alternative Reforms," 38 Law & Contemp. Prob. 436; *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 130 n.98, 93 S. Ct. 1278, 36 L. Ed. 2d 16.

exercise a meaningful choice as to educational services to be offered to students, that the property tax is still a viable means of producing income for education, and that there is no reason why local control needs to be diminished in any degree merely because some system other than the one presently in effect is adopted. We find no reason to reject the validity of these findings. Obviously, absolute equality or precisely equal advantages are not required and cannot be attained except in the most relative sense. Logically, the state may recognize differences in educational costs based on relevant economic and educational factors and on course offerings of special interest in diverse communities. None of the basic alternative plans to equalize the ability of various towns to finance education requires that all towns spend the same amount for the education of each pupil. The very uncertainty of the extent of the nexus between dollar input and quality of educational opportunity requires allowance for variances as do individual and group disadvantages and local conditions.

We also note that the General Assembly has not been unaware of the possible constitutional problems inherent in the operation of the present system. In 1973, it established a "Commission to Study School Finance and Equal Educational Opportunity." Special Acts 1973, No. 73-143. The commission was directed to "conduct a study of, and make recommendations regarding, an equitable system of producing revenue to finance the provision of an equal educational opportunity for all children of the state." Its final report, "arrived at after months of study, analysis, and discussion to fulfill our commitment to provide equality of educational opportunity for all Connecticut children," concluded (p. i) that

the present system of school finance is "inherently inequitable" and that "Connecticut is not providing equal educational opportunity for all its children." It recommended a specific program to correct the situation. It is not our province to discuss the merits of the proposed plan or its implementation, but its very existence as a result of legislative action should serve to stay judicial intervention to afford the General Assembly an opportunity to take appropriate legislative action.

There is no error; however, the Superior Court having refrained from ruling on the plaintiffs' ancillary claims for relief and having retained jurisdiction pending further order of this court, the cases are remanded for further proceedings consistent with this opinion.

In this opinion BOGDANSKI, LONGO and BARBER, Js., concurred. BOGDANSKI, J., filed a concurring opinion and LOISELLE, J., filed a dissenting opinion.

BOGDANSKI, J. (concurring). I am in complete agreement with the language of the majority opinion to the effect that Connecticut has for centuries recognized that it is her right and duty to provide for the proper education of the young; that education is so important that the state has, since colonial days, required towns to maintain local schools and made attendance compulsory; and that this basic educational system has continued to this date with the state recognizing that providing for education is a state duty.

To that I would add that the history of the 1965 constitutional convention proceedings demonstrates that the constitutional provision concerning education, adopted by the convention, formalized free

public education on the elementary and secondary
levels as a fundamental right. A review of that his-
tory reveals the following:

On September 23, 1965, Simon Bernstein, a dele-
gate from the first district, in addressing himself
to the educational resolution stated: "[M]y remarks
are really addressed to section 1 only, which calls
for placing in the Constitution the very fundamental
provision that we shall provide as a Constitutional
right free public school education." Conn. Const.
Conv. Proc., 1965, pt. 1, p. 311.

Thereafter, on October 19, 1965, Bernstein again
spoke concerning an amendment to the resolution:
"[T]he statement of purpose of that resolution of
mine was that our system of free public education
have a tradition[al] acceptance on a par with our
bill of rights and it should have the same Constitu-
tional sanctity." Conn. Const. Conv. Proc., 1965,
pt. 3, p. 1039.

The constitutional provision ultimately adopted
by the convention reads as follows: "There shall
always be free public elementary and secondary
schools in the state. The general assembly shall
implement this principle by appropriate legisla-
tion." Conn. Const. Art. VIII § 1.

I would add further that the right of our children
to an education is a matter of right not only because
our state constitution declares it as such, but be-
cause education is the very essence and foundation
of a civilized culture: it is the cohesive element
that binds the fabric of society together. In a real
sense, it is as necessary to a civilized society as food
and shelter are to an individual. It is our funda-
mental legacy to the youth of our state to enable

them to acquire knowledge and possess the ability to reason: for it is the ability to reason that separates man from all other forms of life.

Indeed, as far back as 1894, in the absence of any constitutional provision, this court recognized how essential and important education is when it stated that "[i]t is a duty . . . [that] has always been assumed by the State; not only because the education of youth is a matter of great public utility, but also and chiefly because it is one of great public necessity for the protection and welfare of the State itself." *Bissell* v. *Davison,* 65 Conn. 183, 191, 32 A. 348.

Finally, it should be observed that the issues raised and pressed on this appeal are directed toward the right of the children of this state to a basic education, and the determination of whether certain statutes of this state unconstitutionally impinge upon that right. We are, therefore, limited to those issues.

The function of this court is to review the actions of the trial court and the conclusions reached by it. Such a review of this case leads to but one result: that the conclusions reached by the trial court are more than amply supported by the subordinate facts.

Loiselle, J. (dissenting). Although education occupies a position of great importance in this state, and *Brown* v. *Board of Education,* 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873, recognizes that today "education is perhaps the most important function of state and local governments" the United States Supreme Court has concluded that social importance is not the criterion by which the funda-

mentality of a right for equal protection purposes is determined. *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 32, 93 S. Ct. 1278, 36 L. Ed. 2d 16; see also *Lindsey* v. *Normet,* 405 U.S. 56, 74, 92 S. Ct. 862, 31 L. Ed. 2d 36.

Nor is the right rendered fundamental simply because it is mentioned in the Connecticut constitution. *Robinson* v. *Cahill,* 62 N.J. 473, 491, 303 A.2d 273; *Olsen* v. *Oregon,* 276 Ore. 9, 554 P.2d 139.

As I review the history of education in Connecticut, it does not support the "fundamentality" of the right. Education was not required to be free until 1869. Public Acts 1869, c. 71; compare with Rev. 1866, tit. 16, c. 3, § 98. In 1894, this court spoke of education as "a privilege or advantage, rather than a right in the strict technical sense of the term.[1] This privilege is granted, and is to be enjoyed upon such terms and under such reasonable conditions and restrictions, as the law-making power, within constitutional limits, may see fit to impose; and, within those limits, the question what terms, conditions, and restrictions will best subserve the end sought in the establishment and maintenance of public schools, is a question solely for the legislature and not for the courts." *Bissell* v. *Davison,* 65 Conn. 183, 191, 32 A. 348.

Over the years, the legislature has been troubled by the disparities in financial capability of the school districts, and has made compensatory grants to the poorer systems. See, e.g., Public Acts 1903, c. 102,

---

[1] The comment is more relevant to the "fundamentality" of education than to its status as a "right." Of course, even a privilege cannot be bestowed in a manner which violates our constitution. Conn. Const. Art. I § 1.

p. 69; Public Acts 1917, c. 371, p. 2543. It can be expected that the legislature will continue to implement this concern in compensatory legislation, but such concern does not render education a fundamental right.

The history of the addition of the provision on education to our constitution in 1965 is, like most legislative history, ambiguous. Statements made at the constitutional convention could be interpreted either way depending upon which point of view is fostered. Taken as a whole, this history is indicative of what the majority opinion has stated, that the constitutional amendment regarding free education on the elementary and secondary level was merely a "codification" of the obligation assumed by the state in its statutory enactments. The constitutional provision would prevent the state from requiring students to pay for education or from denying free education to some while making it available to others, but I do not see that the provision renders education a "fundamental" right.

Furthermore, the amendment regarding education must be read not only with the equal protection clause of the constitution, but also with article tenth, which was, like the education provision, new in the 1965 constitution, and provides specifically that "[t]he general assembly shall by general law delegate such legislative authority as from time to time it deems appropriate to towns." The legislative authority over education is total, and includes the authority to tax for the support of education. Article tenth specifically authorizes the legislature to do what it has done in regard to education: to delegate the responsibility of raising the large part of the funds for its support to the towns.

Nor does the system adopted by the legislature seem to me to be as irrational as "the number of telephone poles in the district." Local control with local fiscal responsibility, even in a property-poor district, is a rational justification for the present statutory scheme. One commentator, noting the lack of interest in education in the days when the income from the sale of the western lands covered most governmental education expenditures, states: "History will show that advancement in education depends largely upon local interest and local initiative, and that both interest and initiative are stimulated by some system of local taxation, instead of by reliance upon an income from a school fund." Ames, History of Education in Connecticut, in 5 Osborn, History of Connecticut, p. 189.

No one argues that the state's financial system causes an absolute denial of educational opportunities to any child or that education received in elementary or secondary schools is not free, as mandated by the state constitution. After you have brushed the foam off the beer, the plaintiffs' argument concerns only one item—money.

The trial court explicitly states, and the majority of this court implicitly holds, that the "appropriate legislation" (article eighth, § 1), by which our legislature is constitutionally required to implement the guarantee of free elementary and secondary education, must be legislation which makes available to all towns the same amount of money per school child. I do not agree. There is nothing in the constitution requiring such an equalized pot of money per town. As I see it, the constitution requires free education, and "appropriate legislation" is legislation which makes education free. I will con-

cede that when the constitution says free education it must be interpreted in a reasonable way. A town may not herd children in an open field to hear lectures by illiterates. But there is no contention that such situations exist, or that education in Connecticut is not meaningful or does not measure up to standards accepted by knowledgeable leaders in the field of education. No doubt the property-poor towns are careful managers of the education dollar, and are likely to give the value of each program much closer scrutiny than is a wealthy town. I am not persuaded that expenditures for educational opportunities above the reasonable minimum mandated by the legislature have any substantial effect on the education of students over the long pull. The Coleman Report (United States Office of Education, Equality of Educational Opportunity), p. 325, suggests that any such thesis is open to serious question. Although the trial court did not make an express finding, it recognized in its memorandum that there is a lessening marginal utility for each successive increment of educational input.

I have difficulty determining on what basis the majority opinion rests, especially when it cites dissenting opinions, which cannot be viewed as authority. The majority opinion states: "We find our thinking to be substantially in accord with the decisions of the New Jersey Supreme Court in *Robinson* v. *Cahill,* 62 N.J. 473, 303 A.2d 273, and the California Supreme Court in *Serrano* v. *Priest,* 18 Cal. 3d 728, 557 P.2d 929 *(Serrano II).*" I assume that this means the court is in accord with the rationales and not just the results reached by those decisions. The rationale of *Serrano* v. *Priest,* 5 Cal. 3d 584, 487 P.2d 1241 *(Serrano I),* which relied upon federal authority, is the same rationale

expressly rejected by the United States Supreme Court in *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16. *Serrano* v. *Priest,* 18 Cal. 3d 728, 557 P.2d 929 (*Serrano II*), in no way states a new rationale; it merely adheres to the result of *Serrano I* on the basis that the educational system violated the state's constitutional provisions, which a footnote in *Serrano I* had stated (p. 596 n.11) meant the same as the federal equal protection clause. It did so even though the state legislature had made a substantial and significant effort to equalize education during the time between the two decisions. In New Jersey, where the state constitution requires that there be a "thorough and efficient system" of education for all, the New Jersey Supreme Court found that the state system was not "visibly geared" to the constitutional mandate, and established no minimum standards, which is not true in Connecticut. And more importantly, in my view, the New Jersey court rejected the "fundamental right" analysis as neither useful nor required. *Robinson* v. *Cahill,* supra, 491.

Up until today, this court has always stated that the due process and equal protection guarantees of our state constitution have the same meaning as their counterparts in the federal constitution. *Roundhouse Construction Corporation* v. *Telesco Masons Supplies Co.,* 168 Conn. 371, 374, 362 A.2d 778; *Karp* v. *Zoning Board,* 156 Conn. 287, 295, 240 A.2d 845. *Rodriguez* unequivocally has ruled that disparities in spending for education between property-rich and property-poor towns do not violate the federal constitution. I see no distinction between the two constitutions in this respect, other than the provision in the state constitution con-

cerning free education in elementary and secondary schools, and, as I have previously stated, I believe that that provision alone does not create a fundamental right so as to invoke close judicial scrutiny in the determination of whether there is a violation of the equal protection clause of the state constitution.

As I read the majority opinion, although it mentions the constitutional provision concerning education, the real ground for its conclusion that education is a "fundamental" right is its historic importance in this state. Other rights to state-provided services have historically been of equal or greater importance in Connecticut, notably the rights to police protection, fire protection and public health services. The state assumed the duty of police protection long before it assumed the duty of free education. Using the rationale of the majority, the rights to these services are as fundamental as the right to free education. If delegating the responsibility for raising funds for education to the towns is an unconstitutional method of carrying out the state's educational function, then such delegation must be equally impermissible in respect to these other historically important functions.

We cannot lose sight of the fact that the issue is not that our children are not getting a sound education, measured by reasonable standards, which will enable them to exercise fully their rights as citizens of their country. The issue is whether, because our state laws allow some towns to furnish a broader spectrum of choice than other towns desire to furnish or feel financially able to furnish, that the system has to tumble down. Both the trial court and my colleagues state that the system need

only be changed to allow equal opportunity to each child in the state. The realities of the matter, as I see it, are that after this decision no system can survive judicial scrutiny so long as there is any inequality.

Our system of school financing, by local taxation and state aid, is one which has steadily extended education and improved its quality. The system has continued to be affirmative and when scrutinizing it under judicial principles we should be sensitive to the efforts the legislature has made.

As the United States Supreme Court in *Rodriguez* has noted, " '[t]he history of education since the industrial revolution shows a continual struggle between two forces: the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children.' " [2] Our system of school financing is responsive to these two forces. While assuring good basic education for all children, it allows and encourages local participation and control.

To paraphrase *Rodriguez,* although this state's system of school financing results in unequal expenditures depending on the wealth of a town, the disparities are not so irrational as to be invidiously discriminatory. This state has persistently endeavored to narrow the differences in levels of expenditures without sacrificing the benefits of local participation. Our system of financing is not the product of purposeful discrimination. It is rooted

[2] J. Coleman, Foreword to Strayer & Haig, The Financing of Education in the State of New York, p. vii, quoted in *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 49, 93 S. Ct. 1278, 36 L. Ed. 2d 16.

in years of experience in this and other states and in major part is the product of responsible studies by qualified people. See *San Antonio Independent School District* v. *Rodriguez,* supra, 55.

Furthermore, it is troubling that the findings of the trial court, in ranking Connecticut towns on the basis of property-per-pupil, have made no mention of the core cities and the role they play in this drama. In *Rodriguez,* the United States Supreme Court pointed out (p. 58) that research projects have concluded that any financing alternative designed to achieve a greater equality of expenditures is likely to lead to higher taxation and lower educational expenditures in the urban centers, a result that would exacerbate rather than ameliorate existing conditions in those areas. These practical considerations cannot determine constitutional questions but they serve to highlight the wisdom of abstaining from judicial interference in matters better left to the legislature.

Even more than the decision made by the court, the implications of the decision alarm me. I do not see any possibility that any system which falls short of total state financing of education, whether through state assumption of the property tax or through other means, will satisfy the demands of equal protection after this decision. If education is indeed a fundamental right in Connecticut, and after this opinion is published it will be so, the strict scrutiny test must be applied to any legislative scheme for financing education. I do not believe that the so-called power equalization system, in which the state awards funds to towns on the basis of the educational tax effort they make, as measured by their net school mill rates, can survive strict

scrutiny, for that system makes the educational expenditures vary in accordance with the willingness of townspeople to tax themselves for education, a factor which has no relation to the needs of the children. An equalization system in which property-rich towns were required to contribute to a state fund distributed to property-poor towns was, in November, 1976, declared unconstitutional in Wisconsin, as in violation of a state constitutional provision that "the rule of taxation be uniform," construed to require that taxes be spent at the level at which they were raised. *Buse* v. *Smith,* 74 Wis. 2d 550, 247 N.W.2d 141. Nor do I believe that merely redistributing the existing state contribution to education in a compensatory manner will suffice; the state contribution is so small in relation to total expenditures for education that the inequality between property-poor and property-rich towns will still be substantial. Indeed, the California Supreme Court in a case relied upon by the majority as authority for its decision, has already rejected a plan which narrowed,[3] but did not close, the educational gap between property-poor and property-rich towns on the basis that such a narrow gap could not pass judicial scrutiny. *Serrano* v. *Priest,* 18 Cal. 3d 728, 557 P.2d 929 *(Serrano II).* Whatever system the state uses, and the opinion states that there are various means open to the legislature, short of total state financing, if the property-poor towns are not brought all the way up the scale to the level of the top property-rich towns, there will be a disparity that will not survive strict judicial scrutiny, that is, if the court does its job. I cannot see any middle ground. If education is brought up

---

[3] The system left only 10 percent of the California school budget to be affected by district wealth. *Serrano* v. *Priest,* 18 Cal. 3d 728, 786, 557 P.2d 929 *(Serrano II)* (Clark, J., dissenting).

to the Darien standard (and I doubt if any system devised will downgrade education in a town which wants the ultimate in education and can afford it), the trial court has found that the state would have to increase its spending for education to over *one billion* dollars per year.