[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case, the New Milford (CT) Board of Education ("plaintiff" or "Board") has applied to this Court under General Statutes § 52-418 to vacate a grievance arbitration award ("Award") which was issued by the State Board of Mediation and Arbitration ("SBMA"), in favor of the International Federation of Professional Technical Engineers, Local 136, AFL-CIO ("defendant" or "Union"), on or about January 7, 1997. The arbitration concerned the plaintiff's suspension and termination of one of its employees, special education paraeducator and Union member Sherrie McAuliffe-Pilch, for taking four days of unauthorized leave from work in February of 1995 to care for her sick 2 1/2-year-old daughter. A tripartite panel of SBMA arbitrators, after separately ruling that the parties' dispute was arbitrable under the terms of their Collective Bargaining Agreement ("Agreement" or "contract"); Ruling on Arbitrability
(4/25/96); held a hearing on the merits of the dispute on July 11, 1996. Approximately six months after the close of the arbitration hearing, the panel issued its written Award.
In the Award, the full panel found that Mrs. McAuliffe-Pilch "was not suspended and terminated for just cause in accordance with Section 4.6A of the contract . . . [because t]he discipline CT Page 15504 was too harsh for the infraction." Award, p. 5. Consistent with that finding, the panel ordered that Mrs. McAuliffe-Pilch's "suspension and termination . . . be reduced to a one school year suspension[, that she] . . . be reinstated immediately[, and that she] . . . be made whole[, with certain specified deductions,] for past wages and benefits from [the one-year anniversary of her suspension] . . . to the reinstatement date." Id.
The plaintiff now claims that the panel's Award must be vacated for the following reasons:
 The arbitrators exceeded their powers in the following ways: 1) in determining that the dispute was arbitrable and in exercising jurisdiction over the claims presented, 2) in issuing an arbitration award more than 15 days after the close of the arbitration proceedings, in violation of Connecticut General Statutes, § 31-98, and 3) in determining that the grievant was not suspended and terminated for just cause.
Application To Vacate Arbitration Award ("Application"), ¶ 7. The plaintiff has supported its Application with a substantial memorandum of law.
In response to the plaintiff's Application, the defendant filed a pleading entitled Answer, Special Defenses And Counterclaim To Confirm Award. In that pleading, the defendant answered the plaintiff's Application by admitting all the historical facts therein pleaded but denying that the plaintiff is entitled to any relief on the basis of those facts. Id., 1-2. The defendant's two special defenses were both directed as follows to the plaintiff's threshold claim that the parties' dispute was not arbitrable: first, that the plaintiff's challenge to arbitrability was untimely, because the plaintiff failed to make it within thirty days of receiving notice of the arbitrators' Ruling on Arbitrability, as allegedly required by General Statutes § 52-420; and second, that "by submitting the issue of arbitrability to the arbitrators, [the plaintiff] waived any rights to contest the arbitrators['] decision."Answer, Special Defenses, And Counterclaim To Confirm Award, p. 2. Finally, in its Counterclaim To Confirm Award, the defendant sought both to confirm the challenged Award and to recover attorney's fees, costs, and double damages for Mrs. McAuliffe-Pilch under General Statutes § 31-72. Answer,Special Defenses, And Counterclaim To Confirm Award, pp. 2-4. CT Page 15505 The defendant has supported its position on the plaintiff's Application and its own Counterclaim with a substantial legal memorandum of its own.
The plaintiff later closed the pleadings by filing an Answer To Defendant's Special Defenses And Counterclaim. In that pleading, the plaintiff denied both of the defendant's special defenses and, though admitting all of the historical facts pleaded in the defendant's Counterclaim, denied that the defendant is entitled to relief on the basis of those facts.
The parties presented oral argument on their Application and Counterclaim in March of 1997. Thereafter, they supplied the Court with supplemental authorities and citations in support of their respective claims. The case is now before this Court for decision based on the following, essentially undisputed set of facts.
 FINDINGS OF FACT
1. From November 3, 1993 through June 30, 1995, the plaintiff Board and the defendant Union were parties to a Collective Bargaining Agreement ("Agreement" or "contract") that established a four-level grievance procedure for the resolution of "any complaint between the Board and an employee, group of employees, or the Union involving the interpretation and/or application of a specific provision(s) of this Agreement." Agreement, § 3.1A. The stated purpose of the contract's grievance procedure was "to secure, at the lowest possible administrative level, equitable solutions to grievances which may arise between the grievant and the Board." Id., § 3.2A.
2. The four levels of the grievance procedure were described as follows in Section 3.4 of the contract:
A. LEVEL ONE — SCHOOL PRINCIPAL OR IMMEDIATE SUPERVISOR
 1. If the grievant is not satisfied with the disposition of the problem through informal procedures, he/she may submit his/her claim as a formal grievance in writing to his/her principal or immediate supervisor. Such claim shall be submitted within fourteen (14) calendar days of the event giving rise to the grievance. The written grievance shall contain a statement of the facts upon which the grievance is CT Page 15506 based and the sections of the contract allegedly violated.
 2. The principal or supervisor shall within ten (10) days render a decision and the reasons therefore [sic] in writing to the grievant, with a copy to the Union.
B. LEVEL TWO — SUPERINTENDENT OF SCHOOLS
 1. If the grievant is not satisfied with the disposition of the grievance at Level One, or in the event that no decision has been rendered within ten (10) days after presentation of the grievance, the grievant may file a grievance in writing to the Superintendent of Schools within five (5) days after the decision at Level One or within fifteen (15) days after the grievance was presented, whichever is sooner.
 2. The Superintendent of Schools shall represent the administration/management at this level. Within ten (10) days after receipt of the written grievance by the Superintendent, the Superintendent shall meet with the grievant to resolve it. The grievant may be accompanied by a representative of the Union.
C. LEVEL THREE — BOARD OF EDUCATION
 1. If the grievant is not satisfied with the disposition of the grievance at Level Two, or if no decision has been rendered within ten (10) days after he/she has first met with the Superintendent, he/she may file a written grievance with the Board of Education within five (5) days after a decision by the Superintendent or fifteen (15) days after he/she first met with the Superintendent, whichever is sooner.
 2. Within thirty (30) days after receiving the written grievance, the Board, or a panel of three members of the Board, to be selected by the Chairman of the Board, shall meet with the grievant and with representatives of the Union for the purpose of resolving the grievance. The decision of the Board shall be rendered in writing within ten (10) days after the meeting. CT Page 15507
D. LEVEL FOUR — IMPARTIAL ARBITRATION
 If the grievant is not satisfied with the disposition of the grievance at Level Three, or in the event no decision has been rendered within ten (10) days after he/she has first met with the Board or Board Panel, the Union may submit the grievance to arbitration within 16 days after receipt of the Board's response or within 26 days after the meeting with the Board or Board Panel, if there is no response.
 The Union may appeal the decision of the Board to the State Board of Mediation and Arbitration in accordance with its rules and regulations. The arbitration decision shall be final and binding. The arbitrator shall have no authority to modify, delete, or add to the language of the contract.
Agreement, § 3.4.
3. The parties further agreed as follows that all time limits for the processing of grievances would be strictly enforced:
 Since it is important that grievance be processed as rapidly as possible, the number of days indicated at each level should be considered as a maximum, and every effort should be made to expedite the process. The time limits, specified may, however, be extended by mutual agreement in writing. If the grievant fails to comply with the time lines of this Article, the grievance shall be considered waived.
Agreement, § 3.3.
4. Finally, on the subject of discipline or dismissal of a Union employee, the contract established the following standards and procedures to govern and ensure review of the Board's actions:
 The Board will act in good faith and for just cause in the event of discipline or dismissal of any employee included in this Agreement. Should there be any dispute between the Board and the Union concerning the existence CT Page 15508 of just and sufficient cause for such dismissal, it shall be subject to the grievance procedure in this Agreement.
Agreement, § 4.6A.
5. In January of 1995, Union member Sherrie McAuliffe-Pilch was employed by the defendant Board as a paraeducator in the special education program at the Schaghticoke Middle School in New Milford. Ruling on Arbitrability, p. 2. As such, she was a member of the defendant Union, which was recognized by the parties' contract as "the exclusive representative of a unit consisting of all the employees of the Board employed as paraeducators and security guards in the public school system of New Milford. . . ." Agreement, Article I.
6. Before January of 1995, in the six-plus years of her employment by the Board, Mrs. McAuliffe-Pilch had proven herself to be an excellent, conscientious worker. Award, p. 4. Even so, after the birth of her daughter in May of 1992, she began to experience difficulty balancing the demands of her job and the special medical needs of her daughter, who had been born with and continued to suffer from respiratory problems for which she needed a bronchial dilator to assist her in breathing. Id., 2-3. Mrs. McAuliffe-Pilch had attempted persistently, but without success, to find suitable home care or nanny services for her daughter. Id., 3. Therefore, when her daughter became ill; she felt she had no option but to take time off from work to care for her daughter herself, using her sick leave and personal leave days in the process. Id., 4.
7. By early January of 1995, with no end to her daughter's respiratory problems in sight, Mrs. McAuliffe-Pilch had used up nearly all of her accumulated sick leave and personal leave days.Award, p. 2. Aware of that fact, she applied to the Board for a leave of absence without pay to care for her child. Id.
8. The Board denied Mrs. McAuliffe-Pilch's request for unpaid leave, and communicated its decision to her both in a telephone call from district Director of Personnel Dr. John J. Robinson and in a follow-up letter from Dr. Robinson. Award, p. 2. In the phone call, Dr. Robinson
 instructed [Mrs. McAuliffe-Pilch] that she should not take any unauthorized leave days because to do so CT Page 15509 would jeopardize her employment. Rather, he suggested that [she] resign and reapply without prejudice. There was then discussion of the number of sick days and personal leave days for her child's illness.
Id. In his follow-up letter, dated January 11, 1995, Dr. Robinson advised Mrs. McAuliffe-Pilch "when she would be out of sick days and personal leave days and his expectation [that] she would return to work at that time." Id.
9. By mid-January of 1995, due to a personal illness and another recurrence of her daughter's respiratory problems, Mrs. McAuliffe-Pilch had used up all of her sick leave and personal leave days. Award, p. 2. Thus in early February, when her daughter developed yet another respiratory infection, Mrs. McAuliffe-Pilch was presented with the impossible choice between neglecting her daughter or staying home and jeopardizing her job.Id., 3. Understandably, she decided to stay home from work, and so advised the school, although she was aware that her absence would have a negative impact on the school's special education program and place a burden on her follow paraeducators. Id. She remained out of work for four days. Id.
11. As a result of her unauthorized leave, Mrs. McAuliffe-Pilch was given a written warning dated February 9, 1995, then docked four days' pay and suspended without pay from February 15, 1996 until the next meeting of the Board's Operations Committee, which hears grievances on behalf of the Board. Ruling on Arbitrability, p. 3.
12. The Union filed a grievance on this suspension on February 23, 1995 with Mrs. McAuliffe-Pilch's (hereinafter "the grievant's") immediate supervisor, Schaghticoke Middle School Principal Donald Fiftal. Claiming that the grievant's four authorized days of leave had been due to extenuating circumstances surrounding her seriously sick child, the Union requested that
 [t]o remedy this situation, . . . Mrs. Pilch's request for an unpaid leave of absence be reconsidered on grounds of extreme hardship and all mention of suspension be removed from her personnel file.
Letter of Union President Hannah Nagle to Schaghticoke MiddleCT Page 15510School Principal Donald Fiftal dated 02/23/95 (appended toPlaintiff's Memorandum of Law In Support Of Application To VacateArbitration Award).
13. Mr. Fiftal responded to the Union's above-described grievance letter on the very day it was received. Declining to address the merits of the grievance, however, he redirected the Union and the grievant to the Superintendent of Schools, who had issued the suspension. Ruling on Arbitrability, p. 2. The grievance letter was thereafter forwarded to the Director of Personnel, who acknowledged its receipt on February 28, 1995 and stated that he and the Superintendent would be "glad to meet with you regarding the case." Id.
14. On March 6, 1995, a meeting was attended by the grievant, Union representatives, and the Superintendent to discuss the grievance. Ruling on Arbitrability, p. 2. In that meeting, the Superintendent advised the grievant that "on April 4, 1995, I will ask the Board if they wish to re-consider [sic] its [sic] denial of a leave-of-absence. If they refuse, I will recommend that [you] be dismissed as soon as possible under the terms of your contract[.]" Id.
15. On April 3, 1995, the Operations Committee of the Board of Education met. The grievant and the Union representatives were not permitted to address the Committee. Thereafter, on April 11, 1995, the Board of Education met and voted to terminate the grievant's employment. Ruling on Arbitrability, p. 2; effective April 12, 1995; Award, p. 3.
16. By a letter dated April 28, 1995, the Union requested arbitration with the SBMA concerning "unjust disciplinary actions taken by the Employer against the Employee." Ruling onArbitrability, p. 2. In a separate letter of even date, the Union notified the Chairman of the Board of Education that it was grieving the termination. Id. In that second letter, the Union stated that it was "combining two grievances and will be submitting the combined grievances immediately to arbitration."Id.
17. On September 26, 1995, a tripartite panel of SMBA arbitrators held a preliminary hearing on the following issues:
Is this matter arbitrable? CT Page 15511
If so, what shall be the remedy?
Ruling on Arbitrability, p. 1. Thereafter, on April 25, 1996, it issued a written Ruling of the Board, in which the full panel held that
These matters are arbitrable.
A hearing on the merits shall be scheduled.
Ruling on Arbitrability, p. 4. In its Ruling, the panel explained its reasoning as follows:
 This case involves the termination of the grievant following a suspension without pay. The Board argues that the grievance on the suspension is not arbitrable since the Union bypassed the three levels of the grievance procedure and submitted the grievance directly to the SBMA. Moreover, the decision to terminate required the filing of a separate grievance such that at a minimum, the Union should not be allowed to be heard on the merits of the termination case.
 A full panel finds that the both the suspension and the termination shall be heard on their merits. Addressing the suspension grievance first, the panel finds it would have been better practice for the Union to carefully follow the written requirements of the grievance procedure outlined above. However, Levels One and Two were met by the February 23, 1995 letter which was responded to by the Director of Personnel who stated that he and the Superintendent would meet with the Union on the grievance. Combining this with testimony by Dr. Robinson that the Operations Committee was the body that had heard grievances in the past and the panel's view that all doubts must be resolved in favor of the Union when deciding an arbitrability issue, we find that the Union followed in substance (if not in perfect form) the grievance procedures as it related to the suspension.
 We are also persuaded by the Union's argument that given the unique facts in this case, it was not improper to combine the termination with the suspension at the SBMA level. When it filed the grievance on the suspension to the Principal at Level One, the Union was informed that CT Page 15512 it should file directly with the Superintendent. The Union interpreted this response as instructing it to submit the grievance directly to the Level at which the discipline was issued. Since the decision to suspend was made by the Superintendent, the Union was instructed to submit the grievance suspension there. Accordingly, when it came time to file the termination grievance, the Union thought it futile to submit the grievance to the Principal and lower levels. Since the decision to terminate was made by the Board of Education, the Union notified the Chairman of the Board of Education (See J1, P. 2) that it was filing for arbitration. Once again, while it would have been better practice to carefully adhere to the contractual mandates as outlined in Article III even though some levels might be viewed as futile, it was not unreasonable for the Union to treat the termination as an extension of the unresolved suspension at Level Three and combine grievances before proceeding to Level Four.
Ruling on Arbitrability, p. 3.
18. The SBMA arbitration panel held a hearing on the merits of the grievant's combined grievances on July 11, 1996. Thereafter, on January 7, 1997, it issued a written Award in which it restated and answered the issue presented as follows:
ISSUE
 Was Mrs. Sherry McAuliffe-Pilch suspended and terminated by the New Milford Board of Education for just cause in accordance with Section 4.6A of the contract?
If not, what shall the remedy be?
* * * *
AWARD
 Mrs. Sherry McAuliffe-Pilch was not suspended and terminated for just cause in accordance with Section 4.6A of the contract. A full panel finds that the discipline in this case was too harsh for the infraction. The suspension and termination shall be reduced to a one school year suspension and the grievant CT Page 15513 shall be reinstated immediately. The grievant shall also be made whole for past wages and benefits from February 15, 1996, with a reduction in the monetary award for any unemployment compensation or wages from alternative employment, except for wages from otherwise allowable summer employment, from February 15, 1996 to the reinstatement date.
Award, pp. 1, 5.
19. In issuing the foregoing Award, the panel found facts as indicated in paragraphs 16-18 above, then made the following observations:
 The record in this case reveals an excellent, conscientious worker whose unfortunate life circumstances placed her in the difficult position of having no remaining authorized time off, no viable daycare alternatives after considerable effort on her part, and a sick child at home. While the grievant's testimony revealed that she understood that taking the four days off would lead to discipline, we find that the imposition of the ultimate penalty of termination was not justified in this case.
 The grievant was not given an opportunity to improve her conduct in this case; she was not given lesser discipline prior to termination accompanied by a notification of the possible consequences of continuing absences so that she could have the opportunity to change her conduct, if a all possible. Indeed, Dr. Robinson admitted that the grievant was never given an opportunity to correct her behavior. Nor was the degree of discipline administered by the Board reasonably related to the seriousness of the offense and the record of this grievant's service to the Board.
 This panel is not persuaded by the Board's position that the termination was justified in part due to the grievant's statement that she would probably be required to be absent additional days due to her child's illness. While it was certainly within the Board's purview to mete discipline for unauthorized days actually taken, to the extent that the discipline addressed possible future
unauthorized days off, the Board's action smacks of CT Page 15514 anticipatory discipline which is not just. Further, this panel does not agree with the Board's view that its offer of resignation was a viable alternative which the grievant could have and should have accepted to avoid any discipline. Since the offer was not accompanied by a guarantee that the grievant would be rehired at the point in time that her child could be cared for by others, it was not unreasonable that the grievant refuse an offer which would put continued future employment at risk.
Award, pp. 4-5.
20. The plaintiff commenced the instant action on February 8, 1997.
 LEGAL ANALYSIS I. CHALLENGE TO ARBITRABILITY
The plaintiff first argues that the arbitrators' award must be vacated because the parties' dispute was not arbitrable under the terms of their Collective Bargaining Agreement ("Agreement"). It claims, more particularly, that the dispute was not arbitrable because the defendant filed for arbitration without first presenting the dispute for resolution at each level of the grievance procedure set forth in Article III of the Agreement.[1]
The defendant counters the foregoing argument in three ways. First, it contends that this Court lacks the power to decide the question of arbitrability because the parties, by their Agreement, empowered the arbitrators to decide that question. Second, it argues that even if this Court is not precluded by the parties' Agreement from deciding the question of arbitrability, the plaintiff waived its right to seek a judicial determination of that question by agreeing to submit it for the decision of the arbitrators, then failing to move to vacate their "award" on arbitrability within thirty days of its issuance. Third and finally, the defendant claims that even if the question of arbitrability is now properly before this Court, the arbitrators' ruling on that question was both factually and legally correct.
 A
CT Page 15515
"`Whether a particular dispute is arbitrable is a question for the court unless, by appropriate language, the parties have agreed to arbitrate that question, also.' Welch Group, Inc. v.Creative Drywall, Inc., 215 Conn. 464, 467, 576 A.2d 153 (1990), quoting Frager v. Pennsylvania General Ins. Co., 155 Conn. 270,274, 231 A.2d 531 (1967). Whether the parties have agreed to submit the merits of the dispute, as well as the question of arbitrability, depends on the intention manifested in the agreement the parties have made. Bridgeport v. Bridgeport PoliceLocal 1159, 183 Conn. 102, 104, 438 A.2d 1171 (1981). The manifestation of arbitrability may be by express provision to that effect or the use of broad terms; White v. Kampner,229 Conn. 465, 472, 641 A.2d 1381 (1994); and courts must look to the plain language of the contract and construe the contract as a whole when determining the intent of the parties. Id., 473."Weitz Co. v. Shoreline Care Ltd. Partnership, 39 Conn. App. 641,644, 666 A.2d 835 (1995).
Notwithstanding the foregoing test, Connecticut courts have been reluctant to find that, in the absence of express contractual language to that effect, contracting parties have agreed, by their use of broad terms, to submit the question of arbitrability under their agreements to the arbitrators. Thus, though such findings have been made in cases "where the contract called for the submission to arbitration of `[a]ny dispute that cannot be adjudicated between the Employer and the Union';International Brotherhood v. Trudon Platt Motor Lines, Inc.,146 Conn. 17, 20, 147 A.2d 484 [(1958)]; and where arbitration was required of `[a]ll questions in dispute and all claims arising out of said contract'; Liggett v. Torrington BuildingCo., 114 Conn. 425, 430, 158 A. 917 [(1932);]" Policemen's Firemen's Retirement Board v. Sullivan, 173 Conn. 1, 6,376 A.2d 399 (1977); they have been refused in other cases where, though the language of the arbitration clause was very broad, such language did not "clearly demonstrate" a purpose to exclude the question of arbitrability from judicial review.
In Policemen's Firemen's Retirement Board v. Sullivan, for example, the Connecticut Supreme Court held that the question of arbitrability was not arbitrable under the parties' agreement because the arbitrator's power was contractually "limited by the submission and confined to the interpretation and/or application of the provisions of this Agreement." Id., 8. In so ruling, the Court expressly followed the leading federal case of UnitedSteelworkers of America v. Warrior Gulf Navigation Co., CT Page 15516363 U.S. 574, 583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 [(1960)], where the United States Supreme Court ruled that the question of arbitrability was for the court to decide despite language in the contract providing for the arbitration of "all disputes between the parties as to the meaning, interpretation and application of the provisions of this agreement." Policemen's Firemen'sRetirement Board v. Sullivan, supra, 173 Conn. at 8-9. Similarly, in Scinto v. Sosin, 51 Conn. App. 222, 227-28, ___ A.2d ___ (1998), the Appellate Court recently held that in the absence of an express contractual provision to that effect, even the language of the subject contract's "very broad arbitration clause" was insufficient, standing alone, to support an inferential finding of intent to arbitrate the question of arbitrability. There, where the arbitration clause in question covered "[a]ny controversy or Claim arising out of or related to the contract[,]" the Court explained that:
 The arbitration clause defines the scope of arbitration. It, however, does not provide for arbitration of arbitrability. The defendants' claim that the broad arbitration clause denies the trial court the power to determine the underlying issue of arbitrability is unsupported. We hold that . . . the broad arbitration clause does not, by itself, deny the trial court jurisdiction to decide the matter of arbitrability, because the parties did not manifest an intention to arbitrate the issue of arbitrability.
Id., 230.
Against this background, it is apparent that under the instant Agreement, the question of arbitrability is lawfully subject to judicial review. To begin with, the Agreement contains no provision expressly stating that that question is to be decided by the arbitrators. Furthermore, though the language of the Agreement's arbitration clause broadly extends the right of arbitration to "any complaint between the Board and an employee, group of employees, or the Union involving the interpretation and/or application of a specific provision(s) of this Agreement," which is not resolved to the Union's satisfaction at a lower level of the grievance procedure, it is surely no broader than those held not to make the question of arbitrability arbitrable in Policemen's Firemen's Retirement Board v. Sullivan andScinto v. Sosin. Accordingly, the question of arbitrability is now properly before this Court. CT Page 15517
 B
The defendant's two procedural arguments in opposition to the plaintiff's challenge to the arbitrability of this dispute are easily disposed of. The first such argument, to restate it, is that this Court lacks subject-matter jurisdiction over the plaintiff's arbitrability challenge because the plaintiff failed to file that challenge within thirty days of the arbitration panel's Ruling on Arbitrability. This argument is expressly based on the assumption that the Ruling on Arbitrability was a final award which became subject to judicial review, on a motion to vacate under General Statutes § 52-418, as soon as it was issued. For the following reasons, however, the defendant's assumption is in error, and thus its argument is without foundation.
In Borough of Naugatuck v. AFSCME, Council #4, 190 Conn. 323,460 A.2d 1285 (1983), the Connecticut Supreme Court was called upon to decide if an arbitration panel's ruling on arbitrability could be reviewed on a motion to vacate before the panel issued a final award on the merits of the parties' dispute. The trial court had dismissed the plaintiff-appellant's motion to vacate for lack of subject-matter jurisdiction. The defendant-appellee urged the Supreme Court to affirm the trial court's decision, arguing that the arbitration panel's ruling on arbitrability was merely preliminary, and thus could not be appealed on a motion to vacate unless and until it became part of a final award. The plaintiff-appellant, in opposition, argued that the trial court's ruling should be reversed. Though it acknowledged that the panel's ruling on arbitrability was preliminary, it claimed that the trial court had "the equitable power" to decide the question of arbitrability prior to a hearing on the merits of the grievance. Id., 324.
Agreeing with the defendant that the panel's ruling on arbitrability could not be reviewed on a motion to vacate until it became part of a final award on the merits of the grievance, the Supreme Court upheld the decision of the trial court in the following terms:
 Arbitration affords a contractual remedy with a view toward expediting disputes. "Section 52-418 only authorizes a court to vacate an arbitrator's `award' and then only under narrow circumstances. Unless an CT Page 15518 arbitration decision is an award, therefore, there is no right of appeal. This court has held that a finding on arbitrability is not an award until it becomes part of an award on the merits. Conte v. Norwalk, [173 Conn. 77, 79-80, 376 A.2d 412 (1977)]. Therefore, a party must demonstrate that an `award' on the merits has been rendered before any right to appeal attaches." State v. Connecticut Employees Union Independent, 184 Conn. 578, 580, 440 A.2d 229 (1981). In advocating that the court use its equitable powers to prevent further action by the board, the plaintiff insists that "the entire contract [the collective bargaining agreement] lacks any all inclusive language that could be construed in a manner suggesting that the parties intended to submit the question of arbitrability to the arbitrators." The debility of this claim is the fact that the plaintiff did submit the question to arbitration — a procedure which implicates the policy advocating a minimum of judicial intrusion. Had the plaintiff wished to obtain, ab initio, a judicial determination of the issue of arbitrability, it could have sought the aid of the court to resolve that question before submitting the question to arbitration. New Britain v. Connecticut State Board of Mediation and Arbitration, 178 Conn. 557, 560, 424 A.2d 263 (1979).
 Having authorized the arbitrators to decide the issue of arbitrability, the plaintiff cannot now appeal to the court's equitable powers for injunctive relief before proceeding to arbitrate the issue on the merits. Once the debate has begun, it cannot be interrupted relative to a claimed error by a participating team. A decision relative to a protest must be sought at the close of the polemics. Thus, even if it is assumed, for the sake of argument, that the board returns an unfavorable decision on the merits of the defendant Brown's claim, the borough may at that time contest the arbitrability issue. "In such cases a court, on a motion to vacate, may properly entertain a challenge to an award alleging disregard of the limits in the parties' agreement with respect to arbitration." New Britain v. Connecticut State Board of Mediation and Arbitration, supra; see Conte v. Norwalk, supra, 79.
Borough of Naugatuck v. AFSCME, Council #4, supra, 190 Conn. at CT Page 15519 326-27.
The upshot of the foregoing analysis is as significant as it is obvious. A judicial challenge to the arbitrability of a dispute may properly be raised on a motion to vacate an arbitration award, but the motion to vacate cannot be filed until after a final award on the merits has been issued. Here, then, the plaintiff's motion to vacate was timely filed, because it was filed less than thirty days after the panel issued its final award.
The defendant's second procedural challenge to the arbitrability of the instant dispute is that the plaintiff waived its right to seek a judicial determination of arbitrability by agreeing to submit the question of arbitrability to the arbitrators. That challenge must also be rejected on the basis of the Supreme Court's decision in Borough of Naugatuck v. AFSCME,Council #4, supra. There, as previously noted, the parties had submitted the question of arbitrability to the arbitrators instead of seeking a prior judicial determination of that issue. Even so, the Supreme Court made it clear that the result of that choice would not be a waiver of the right to judicial review, but a postponement of the time of such review until after the arbitrators had issued their final award on the merits. Hence, to restate it, the Court's unambiguous conclusion:
 Having authorized the arbitrators to decide the issue of arbitrability, the plaintiff cannot now appeal to the court's equitable powers for injunctive relief before proceeding to arbitrate the issue on the merits. Once the debate has begun, it cannot be interrupted relative to a claimed error by a participating team. A decision relative to a protest must be sought at the close of the polemics. Thus, even if it is assumed, for the sake of argument, that the board returns an unfavorable decision on the merits of the defendant Brown's claim, the borough may at that time contest the arbitrability issue. "In such cases a court, on a motion to vacate, may properly entertain a challenge to an award alleging disregard of the limits in the parties' agreement with respect to arbitration." New Britain v. Connecticut State Board of Mediation and Arbitration, supra; see Conte v. Norwalk, supra, 79.
Borough of Naugatuck v. AFSCME, Council #4, supra, 190 Conn. at CT Page 15520 327.
In the later case of White v. Kampner, 229 Conn. 465,641 A.2d 1381 (1994), the Supreme Court revisited the issue of whether a party waives his right to a judicial determination of arbitrability by voluntarily submitting that question to the arbitrators. Reaffirming the foregoing analysis, the White Court concluded that such a voluntary submission did not constitute a waiver of judicial review, provided the party later seeking such review raised his objections to arbitrability before the arbitrators. There, where the issue of arbitrability had been submitted to the arbitrators "in the context of the defendant's objection to the arbitration proceedings," id., 478, the Court concluded that the defendants had "preserved their objection to the arbitration, . . . [and with it] the option of committing the issue to the arbitrator without risking any waiver of their right to have the issue ultimately determined by the trial court." Id.
The Court thus held that "[u]nder these circumstances, . . . the defendants did not waive consideration of the issue of arbitrability by the trial court." Id.
In this case, as in White v. Kampner, the plaintiff has made it clear from the outset that it contests the arbitrability of the instant dispute. Having preserved its objection to arbitrability before the arbitrators, it cannot be deemed to have waived a judicial determination of that issue by agreeing to submit that issue to them. The defendant's argument to the contrary is without merit.
 C
In deciding if a dispute is arbitrable under a contract, the Court is plainly bound by the terms of the contract, which it cannot modify or ignore for any purpose. Hence, though arbitration is favored by our courts; White v. Kampner, supra,229 Conn. at 472; and a finding of non-arbitrability should not be made "unless it may be said that there is positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute[;]" Board ofEducation v. Frey, 174 Conn. 578, 582, 392 A.2d 466 (1978), quoting United Steelworkers of America v. Warrior GulfNavigation Co., supra, 363 U.S. at 582-83; the court cannot require a contracting party to arbitrate any dispute which he has clearly not agreed to arbitrate. CT Page 15521
The plaintiff bases its challenge to the arbitrability of the instant dispute on the defendant's alleged failure to comply with certain mandatory prerequisites to arbitration set forth in the parties' Agreement. If it is correct in this contention, then the award of the arbitration panel must be vacated under well-established principles of Connecticut law. See, e.g., Fragerv. Pennsylvania General Ins. Co., 161 Conn. 472, 477,289 A.2d 896 (1971).
The Agreement establishes a four-level grievance procedure which the Union must pursue at every level before it can present a grievance for arbitration before the State Board of Mediation and Arbitration. The stated purpose of that procedure is "to secure, at the lowest possible administrative level, equitable solutions to grievances which may arise between the grievant and the Board." Agreement, § 3.2.A.
At Level One of the grievance procedure, as described in Section 3.4.A.1 of the Agreement, any member of the defendant Union who "is not satisfied with the disposition of the problem through informal procedures . . . may submit . . . her . . . claim as a formal grievance in writing to . . . her principal or immediate supervisor[.]" Id. The principal or immediate supervisor must render a written decision on the grievance within ten days, stating reasons for the decision therein. Id., § 3.4.A.2.
At Level Two, a grievant who "is not satisfied with the disposition of the grievance at Level One . . . may file a grievance in writing to the Superintendent of Schools[.]" Id., § 3.4.B.1. The Superintendent, as the representative of management at this Level, must "meet with the grievant[, who may be accompanied by a Union representative,] to resolve [the grievance]." Id., § 3.4.B.2. The Superintendent must render his decision within ten days, though he need not do so in writing or state his reasons therefor. Id.
At Level Three of the grievance procedure, a grievant who is not satisfied with the disposition of the grievance at Level Two may file a written grievance with the Board of Education within five days after a decision by the Superintendent or fifteen days after he/she first meets with the Superintendent, whichever is sooner. Id., § 3.4.C.1. Within thirty days after receiving the written grievance, either the full Board or a three-member panel thereof designated by its Chairman must meet with the CT Page 15522 grievant and Union representatives "for the purpose of resolving the grievance." Id., § 3.4.C.2. Not more than ten days after that meeting, the Board must render its decision in writing. Id.
Finally, if the grievant is not satisfied with the disposition of the grievance at Level Three, the Union may proceed to Level Four of the grievance procedure by submitting the grievance to arbitration. Id., § 3.4.D.
The plaintiff here contends that the defendant unlawfully filed for arbitration on two separate grievances — one concerning her suspension, one concerning her termination — without in either case complying with the above-described procedures. The "suspension grievance," contends the plaintiff, was not properly presented or pursued at either Level Two or Level Three of the grievance procedure, for the following reasons. At Level Two, claims the plaintiff, the defendant failed to file her grievance in writing with the Superintendent of Schools and confined the substance of her meeting with him to matters other than her suspension, to wit: the number of sick days to which she was entitled and the possibility of reconsidering her request for a leave of absence to care for her sick child. According to the plaintiff, the defendant never raised the issue of her suspension with the Superintendent, either orally or in writing. At Level Three, continues the plaintiff, the defendant similarly failed to file her grievance in writing. For that reason, argues the plaintiff, the Board's April 1995 meeting concerned only a reconsideration of the grievant's request for a leave of absence, not the appropriateness of her suspension. The plaintiff thus concludes that the grievant's suspension was not arbitrable because of the defendant's failure to comply with the procedural requirements of the parties' Agreement.
As for what it terms the defendant's "termination grievance," the plaintiff claims that the defendant bypassed every level of the grievance procedure, never presenting her complaint in any form to her principal or immediate supervisor, to the Superintendent of Schools, or to the Board of Education before filing for arbitration on it. Noting that contested decisions to terminate employment are explicitly made subject to the Agreement's four-level grievance procedure; id., § 4.6A; the plaintiff concludes that the grievant's termination, like her suspension, was not arbitrable for failure to comply with the procedural prerequisites to arbitration in the parties' CT Page 15523 Agreement.
In its Ruling on Arbitrability, the arbitration panel rejected the foregoing arguments for two basic reasons. First, the panel considered the "suspension grievance" and the "termination grievance" not as two separate grievances, each requiring separate submission to and exhaustion of remedies at each level of the grievance procedure, but as two interrelated parts of a single grievance arising from the conflict between the demands of the grievant's job and her professed need for time to care for her sick child. The only reason why the grievance acquired new features as it wended its way through the grievance procedure was that the plaintiff's response to the underlying conflict escalated from the suspension of the grievant to her termination from employment. Hence, though a termination is separately grievable under the Agreement, the defendant was not obliged to start the grievance procedure all over again when the plaintiff responded to her initial grievance by voting to terminate her. Second, the panel found that any technical deviations by the defendant from the formalistic requirements of the grievance procedure were both minor and understandable, having each been induced by the plaintiff's own conduct in response to the grievance at each and every administrative level. The panel thus concluded that the defendant did everything reasonably required of it by the Agreement to preserve its right to impartial arbitration of this dispute.
This Court is persuaded that the instant dispute is arbitrable for the reasons set forth in the arbitrators' Ruling on Arbitrability. In particular, the Court agrees: first, that the dispute involves a single grievance which the defendant was not required to refile and pursue again after the plaintiff was terminated to preserve its right to arbitration; and second, that the defendant did everything contractually required of it, at every level of the grievance procedure, to preserve its right to arbitrate that grievance under the terms of the Agreement.
Focusing on the wording of the Agreement, one notes initially that the scope of a grievance is not restricted in fact to a single act, event or practice, or restricted in law to a single alleged violation of the Agreement. Instead, the Agreement defines a grievance as "any complaint between the Board and an employee, group of employees, or the Union involving the interpretation and/or application of a specific provision(s) of this Agreement;" id., § 3.1.A (emphasis added); and provides CT Page 15524 that a grievance may be filed whenever "the grievant is not satisfied with the disposition of the problem through informal procedures[.]" Id., § 3.4.A.1. Accordingly, when the grievant files her written grievance with her principal or immediate supervisor, she defines the scope of her own grievance by stating "the facts upon which the grievance is based," and identifying "the sections of the Agreement allegedly violated." Id. Under these provisions, it is clear that an individual grievance must be based on a single underlying "problem." It is equally clear, however, that that "problem" may arise from an entire group or series of related facts, and may involve multiple alleged violations of the parties' Agreement. Plainly, there is nothing in the Agreement to suggest that different aspects of a single problem must be separately presented in separate grievances.
In this case, the "problem" underlying the defendant's grievance arose from the ongoing conflict between the grievant's professed need to take time off from work to care for her sick child and the demands of her job as a paraeducator in the special education program of the New Milford School System. As presented in the Union's letter to the principal of the grievant's school dated February 23, 1995, the problem involved the grievant's suspension from her job for having taken four unauthorized days of leave to care for her sick her child, after unsuccessfully requesting an unpaid leave of absence for that purpose. "To remedy this situation," the Union representative wrote, "the Union is asking that [the grievant's] request for an unpaid leave of absence be reconsidered on grounds of extreme hardship and all mention of suspension be removed from her personnel file." SeeFindings of Fact, ¶ 12, supra at p. 8.
From that day forward, both the factual underpinnings and the questions presented by the parties' dispute were set in stone. The grievant had missed work four days of work to care for her sick child, after unsuccessfully requesting leave for that purpose. Those historical facts would obviously never change; nor would other related events occur in the interim, between the time the grievance was filed and the date of the grievant's termination, for the grievant was suspended from work throughout that period. The issues presented by the grievance, of course, were whether the grievant's absences to care for her child should be excused on grounds of extreme hardship, and if so, whether she should be disciplined for those absences or her request for unpaid leave should be reconsidered. Indeed, as the grievant's complaint was passed from one administrative level to the next, CT Page 15525 the only aspect of the problem that changed was the particular nature of the plaintiff's disciplinary response to the grievant's conduct, escalating from a suspension to termination.
Against this background, it can hardly be suggested that upon the plaintiff's decision to terminate the grievant, she and/or the defendant was required to file another grievance, raising the same issues that had already been decided, on the same historical facts, before proceeding to arbitration. If they had already exhausted their remedies on those same facts and issues at every level of the grievance procedure preceding arbitration, they could submit their grievance for arbitration without further delay.
Turning, then, to the plaintiff's claim that the defendant did not exhaust its remedies at every level of the grievance procedure, the Court must examine the record before the arbitrators to determine if the parties' Agreement was fully complied with. There is, of course, no question that the defendant properly presented its grievance at Level One of the grievance procedure. Her complaint was timely, it was addressed to her principal, and it contained a detailed statement of the facts underlying her grievance. Appropriately, the plaintiff does not contest the sufficiency of the defendant's efforts at this level.[2]
Having duly submitted its grievance to the grievant's principal at Level One of the grievance procedure, the defendant was entitled to expect a written decision within ten days of its submission. Instead, it received a letter of even date, declining to address the merits of the grievance and redirecting the defendant to the Superintendent, who had issued the challenged suspension. This response, it must be noted, did not comply with the literal terms of the Agreement, for it did not decide the grievance on its merits, much less state reasons for its decision. Logically, however, it turned the grievance over to the representative of management who had the power to decide the issue raised therein, and did so by sending the defendant's written grievance to that representative. Not surprisingly, within five days of the principal's response, the Superintendent, through the School System's Director of Personnel, Dr. John J. Robinson, acknowledged receipt of the defendant's letter by his own letter stating that he and the Superintendent would be "glad to meet with you regarding the case." See Findings of Fact, ¶ 13, supra at 8 (emphasis added). CT Page 15526
Had the Superintendent regarded the principal's forwarding of the defendant's letter to him as a mere courtesy by a fellow member of his staff rather than as a formal referral of an employee's grievance for his review, he need hardly have acknowledged its receipt to the employee and the Union. In that event, moreover, he need not have agreed to meet with the grievant's Union representative to discuss the matter, as required at Level Two of the grievance procedure, much less have suggested that that discussion would concern "the case." Manifestly, in the absence of a formal grievance, there would be no "case" to discuss. Logically, then, the parallelism between the Superintendent's response to the defendant's letter and the response required of him at Level Two of the grievance procedure under the parties' Agreement was no mere accident. Plainly, he, like the defendant Union, regarded the submission of the initial grievance letter as the filing of a formal grievance, and the principal's transmission of that letter to him as a written communication from the grievant, sufficient to invoke her remedies at Level Two. For the plaintiff now to claim to the contrary, that the defendant did not properly pursue its grievance at Level Two because it did not send a separate letter to the Superintendent, repeating what he had already been told in writing, in a letter whose receipt he had acknowledged with words reflecting his intent to treat it as a grievance, is unfair and nonsensical. If there was non-compliance in any sense, it was transparently immaterial, and in any event the product of the plaintiff's own misleading conduct in responding to the grievance.
As for the plaintiff's claim that the defendant failed to pursue its suspension grievance at Level Two of the grievance procedure because it failed to raise the issue of suspension at its March 6, 1995 meeting with the Superintendent, that claim erroneously presupposes that the question of sanctions was logically severable from the excusability of the grievant's underlying conduct. In fact, it was not. From the outset, the problem presented by the defendant's grievance was that she had been disciplined for conduct she claimed to have engaged in due to extreme hardship. In light of that hardship, she formally requested both that all sanctions imposed by the plaintiff be lifted and that she be granted unpaid leave to deal with her hardship in the future should the need arise. Unless the grievance led to a reconsideration of her claim of hardship, it could surely not lead to the lifting of previous sanctions. CT Page 15527 Therefore, if the principal focus of the meeting with the Superintendent was the excusability of the grievant's conduct in light of her claim of extreme hardship, and the appropriateness of granting her unpaid leave to deal with that hardship in the future, the selection of that focus can only be understood as a necessary first step towards reversing previous sanctions, not as the abandonment of the defendant's grievance on that issue. In sum, the Court concludes that the defendant fully pursued its grievance at Level Two of the grievance procedure established by the parties' Agreement.
In fact, it was in the course of the latter discussion that the "problem" raised by the defendant's grievance acquired another aspect, and again was referred, solely at the instance of the plaintiff, to the next level of the grievance procedure. At the end of his discussion with the grievant's Union representative, the School System's Director of Personnel, Dr. Robinson, declared, like the principal before him, that the defendant's grievance could only be resolved at a higher level. Therefore, instead of deciding the matter himself, as contemplated by the Agreement, he referred the matter to the Board of Education, for resolution at its April 1995 meeting. His own recommendation to the Board, which he shared with the Union's representative, would be to terminate the grievant's employmentif the Board could not grant her unpaid leave on grounds of extreme hardship.
By taking this position, the Superintendent did not leave the defendant to its own devices to pursue its grievance further. Instead, he took affirmative measures on his own to move the grievance to the Third Level of the grievance procedure, scheduling the matter for a hearing at the next regular meeting of the Board's Operations Committee. Moreover, instead of suggesting that the Board would be asked to take a new and different action, separately subject to the grievance procedure, by considering the grievant's possible termination if her claim of extreme hardship were rejected, the Superintendent treated his referral to the Board as the next logical step in the handling of the defendant's initial grievance. The facts and the issues remained the same: whether the grievant's unauthorized absences from work were excusable on the ground of extreme hardship, or whether they should result in the imposition of sanctions. Only the nature of the contemplated sanction had changed since the grievance was filed. Naturally, then, both the defendant and the plaintiff treated the Superintendent's referral of the case to CT Page 15528 the Board as the initiation of proceedings on the Third Level of the grievance procedure. The defendant cannot be faulted, or be found to have violated the procedural formalities of the parties' Agreement, by failing to send a letter repeating the contents of her grievance to the Board, since the Superintendent had done that in its stead. Logically, when the Board convened a hearing on those very issues within the time frame established by the Agreement for the processing of grievances at Level Three of the grievance procedure, it clearly communicated its understanding that the grievance had properly reached that level. It cannot now claim that the defendant failed to pursue its remedies at Level Three, when its own representatives transferred the grievance to that level, and it dealt with the grievance in substance at that level, albeit by imposing harsher sanctions upon the grievant than those imposed before the grievance was filed.
 D
In conclusion, the Court agrees with the assessment of the arbitration panel that, "given the unique facts in this case, "the defendant's suspension and termination grievances were arbitrable in a single proceeding, with the latter properly treated as a continuation of the former, and that all prerequisites to arbitration were fully satisfied at each level of the grievance procedure. Any technical deviations from the procedural requirements of the Agreement were only minor, and all were clearly products of the plaintiff's own handling of the subject grievance. Accordingly, the plaintiff's challenge to arbitrability is hereby rejected.
 II. CHALLENGE TO THE TIMELINESS OF THE ARBITRATORS' AWARD
The plaintiff next argues that the arbitrators' award must be vacated because it was not issued within fifteen (15) days of the close of the arbitration proceedings, in alleged violation of General Statutes § 31-98. This argument, however, was not briefed, and thus is deemed abandoned.
 III. CHALLENGE TO THE MERITS OF THE ARBITRATORS' FINAL AWARD
The plaintiff's final challenge to the arbitrators' award is that the award should be vacated because it was issued in violation of public policy. The plaintiff acknowledges, as it must, that any claim that an arbitration award contravenes public policy is an exception to the general rule that review of an CT Page 15529 arbitration award is limited to a comparison of the award to the submission. The basis for such a challenge is that the parties to a collective bargaining agreement cannot expect an arbitration award "approving conduct which is illegal or contrary to public policy to receive judicial endorsement. . . ." City of Stamfordv. Stamford Police Association, 14 Conn. App. 257, 259,540 A.2d 400 (1988). To prevail on such a claim, the plaintiff must show that the award "clearly violates an established public policy mandate." Watertown Police Union Local 541 v. Town of Watertown,210 Conn. 333, 340, 555 A.2d 406 (1989).
In this case, the plaintiff argues that the award of the arbitrators ordering the reinstatement of the plaintiff to her position as a paraeducator violated state and federal laws mandating the provision of educational services and the protection of the rights of students with disabilities. The grievant's actions, claims the plaintiff, placed the plaintiff in a difficult position. The grievant took unauthorized days off from work even though she was warned that by so doing, she would jeopardize her employment. Notwithstanding those warnings, the plaintiff both took the unauthorized days off and advised her supervisors that she would continue to do so if it proved necessary to care for her sick child. As a paraeducator working in the special education program of the plaintiff's School System, there is no question that the grievant's taking of unauthorized leave had a negative impact on her fellow educators. Indeed, the plaintiff so admitted. On that basis, the plaintiff claims that the panel's ordering of her reinstatement will surely burden her program in the future, and thereby compromise its ability to render special education services required by state and federal law. See 20 U.S.C. § 1412(4) and §1414(a)(5); General Statutes § 10-76d. Such a result, claims the plaintiff, clearly contravenes the established policy of state and federal law to provide an appropriate education to all children, Horton v. Meskill, 172 Conn. 615, 376 A.2d 359 (1977), and especially to those with special educational needs. For that reason, claims the plaintiff, the arbitrators' award must be vacated.
The defendant's response to the foregoing argument, with which this Court agrees, is that even if the grievant's unauthorized absences from work had some predictably negative effect on her fellow paraeducators, there was no proof presented, and no finding made, that the ability of the New Milford School System to run its special education program was thereby CT Page 15530 threatened. The plaintiff did not offer evidence that in the absence of the defendant its program could not properly be run. Such a claim, in fact would be hard to justify, for it suggests that the program is deficiently run whenever an employee is out for any reason, justified or otherwise. Nor did the plaintiff attempt to demonstrate any specific way in which the program could be harmed by an unauthorized absence, or whether or not absences could be remedied by the hiring of substitutes or the recruitment of volunteers. In short, the plaintiff's argument is a makeweight, devoid of substance or detail. Instead of meeting its burden of proving that the grievant's conduct compromised the special educational mission of her school, and thus that her reinstatement "clearly violated" public policy, the plaintiff has based its argument on unwarranted speculation, which can hardly serve as the basis for overturning the panel's award. New Havenv. AFSCME Council 15, Local 530, 208 Conn. 411, 417, 544 A.2d 186
(1988).
In conclusion, the Court finds that the plaintiff's final basis for vacating the arbitrators' award must also be rejected. Accordingly, the plaintiff's motion to vacate that award is hereby denied, and the defendant's Counterclaim to Confirm Award is hereby granted.
 IV. DEFENDANT'S REQUEST FOR DOUBLE DAMAGES UNDER GENERAL STATUTES § 31-72
As part of its Counterclaim to Confirm Award, the defendant seeks double damages from the plaintiff under General Statutes § 31-72, which provides as follows:
 When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. The Labor CT Page 15531 Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person.
(Emphasis added.)
To prevail in an action under this statute, despite its broad language, the employee must prove that the wages in question were withheld arbitrarily or in bad faith. See Sansone v. Clifford,219 Conn. 217, 229, 592 A.2d 931 (1991). Here, claims the defendant, the plaintiff's arguments in support of its motion to vacate the arbitration award were clearly without merit, and thus made arbitrarily and in bad faith. Respectfully, this Court disagrees. Though the Court has rejected each of the plaintiff's arguments on its merits, it can surely not find, from the briefs and oral arguments presented, that any such argument was interposed without colorable basis or to defeat the ends of justice. Accordingly, the Court hereby denies the defendant's claim for double damages on behalf of the grievant.
So ordered this 30th day of December, 1998.
Michael R. Sheldon, J.